**MISSOURI PAC. R. CO. v. NORWOOD, Attorney General of Arkansas, et al.**

**No. 501.**

District Court, W. D. Arkansas.

April 28, 1930.

Thomas B. Pryor, of Ft. Smith, Ark., and Edw. J. White, of St. Louis, Mo., for plaintiff.

Hal L. Norwood, Atty. Gen., Joe Joiner, Pros. Atty., for Thirteenth Circuit, of El Dorado, Ark., Chester Holland, Pros. Atty., for Twelfth Circuit, of Ft. Smith, Ark., Donald R. Richberg, Sp. Counsel, of Chicago, Ill., and W. D. Jackson, Sp. Counsel, of Little Rock, Ark., for defendants.

Before STONE, Circuit Judge, and MUNGER and FARIS, District Judges.

PER CURIAM.

This is a bill seeking to enjoin the Attorney General of the State of Arkansas and the prosecuting attorneys of the Twelfth and Thirteenth judicial circuits of that state from prosecuting plaintiff for violation of the "full crew" train (sections 8577–8579, Crawford & Moses Digest of the Statutes of Arkansas for 1921) and switching (sections 8583–8586 of the above Digest) statutes of that state governing operation of freight trains. The bill alleges that these statutes are violative of the Fourteenth Amendment to the Constitution and of the Interstate Commerce Act as amended by the Transportation Act of 1920.

Defendants have filed a motion to dismiss upon various grounds. To avoid possible further argument and by leave of court, defendants deposited an answer which was to be filed and acted upon in case the court should deny the motion to dismiss. This procedure was agreeable to all parties. Affidavits have been filed. The court has heard argument and briefs have been submitted.

We first consider the motion to dismiss. The first ground of this motion is that this is a suit against a state. This contention is answered by a long line of decisions, among which are the following: Old Colony Trust Co. v. Seattle, 271 U. S. 426, 430, 46 S. Ct. 552, 70 L. Ed. 1148; Greene v. L. & I. R. R. Co., 244 U. S. 499, 506, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88; Harrison v. Railroad, 232 U. S. 318, 332, 34 S. Ct. 333, 58 L. Ed. 621, L. R. A. 1915F, 1187; Hopkins v. Clemson Agr. College, 221 U. S. 636, 642, 31 S. Ct. 654, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243; Ex parte Young, 209 U. S. 123, 149, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Prout v. Starr, 188 U. S. 537, 543, 23 S. Ct. 398, 47 L. Ed. 584.

The second ground of the motion is that this action is not allowable since it seeks to enjoin the enforcement of criminal statutes and that the bill shows plaintiff has not availed itself of the "full and complete remedy that it has under the laws of the State governing practice and procedure in its the State's courts." The bill alleges that certain

prosecutions have taken place, others are in course, and yet others threatened. Obviously, a property right of plaintiff is involved in the enforcement of these statutes. Where such is the case and where a multiplicity of such prosecutions are involved, a court of equity may intervene even though the effect is to enjoin the enforcement of criminal laws. Yu Cong Eng v. Trinidad, 271 U. S. 500, 507, 46 S. Ct. 619, 70 L. Ed. 1059; Truax v. Raich, 239 U. S. 33, 37, 36 S. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283.

The third ground is that no appeal was taken from the prosecutions which have gone to judgment and that plaintiff should have availed itself of an appeal from the justice of the peace (before whom the judgments were entered) to the state circuit court, thence to the State Supreme Court, and thence, by writ of error, to the United States Supreme Court. If the violations covered by such judgments were all that were involved in this proceeding, there would be much force in the above suggestion. But where the statutes provide (as here) that "each freight train" so run and each switching "crew" so operated shall be a separate offense, and where the purpose of the bill is to prevent all prosecutions in the future, the inadequacy of the above procedure is evident. While the tedious journey of appeal through three consecutive courts is being traveled, the plaintiff is compelled to submit to the statutes and undergo losses it can never recover.

The remaining grounds of the motion go to the sufficiency of the bill to state a cause for relief and may be treated together. The first ground for relief alleged in the bill is a violation of the Fourteenth Amendment. Defendants' claim as to this is advanced in the motion to dismiss and is that the validity of these two statutes has been sustained. That position is well taken. This statute as to the full train crew was before the Supreme Court of Arkansas (Chicago, Rock Island & Pac. Ry. Co. v. State, 86 Ark. 412, 111 S. W. 456) and passed, by writ of error, to the Supreme Court of the United States (219 U. S. 453, 31 S. Ct. 275, 55 L. Ed. 290). Its validity was sustained in both courts. This full switching crew statute was before the state court (St. Louis, I. M. & S. Ry. Co. v. State, 114 Ark. 486, 170 S. W. 580) and passed, by writ of error, to the Supreme Court of the United States (240 U. S. 518, 36 S. Ct. 443, 60 L. Ed. 776), being sustained in both courts.

The second ground of the bill is that Congress has occupied this field since the above decisions (the latest being in 1916). In the train crew decision (219 U. S. 453, at page 466, 31 S. Ct. 275, 279, 55 L. Ed. 290), the court said:

"Undoubtedly, Congress, in its discretion, may take entire charge of the whole subject of the equipment of interstate cars, and establish such regulations as are necessary and proper for the protection of those engaged in interstate commerce. But it has not done so in respect of the number of employees to whom may be committed the actual management of interstate trains of any kind. It has not established any regulations on that subject, and until it does, the statutes of the state, not in their nature arbitrary, and which really relate to the rights and duties of all within the jurisdiction, must control."

Therefore, the question here is not as to the power of Congress exclusively to occupy the field covered by these state statutes, but it is whether it has, in fact, done so. The bill alleges that such statutes "would defeat the general and comprehensive scheme of federal regulation prescribed by (a) the Interstate Commerce Act, as amended by the Transportation Act of 1920, and (b) by the Railroad Labor Act of 1926." The bill then proceeds to particularize, as follows:

"XI. Conflict with Interstate Commerce Act, as Amended.

"Section 13 of the Act to Regulate Commerce, as amended February 28, 1920, gives the Interstate Commerce Commission complete jurisdiction to prescribe 'the rate, fare, charge, classification, regulation, or practice,' which must be adopted and put into effect by interstate carriers, and the Interstate Commerce Commission is given authority by Congress, after hearing, to fix and determine 'any such rate, fare, charge, classification, regulation, or practice which may cause an undue or unreasonable advantage, preference or prejudice as between persons or localities in intrastate commerce, on the one hand, and interstate or foreign commerce on the other hand, or any undue, unreasonable or unjust discrimination against interstate or foreign commerce, and to prescribe the rate, fare, charge, classification, regulation, or practice thereafter to be observed in such manner as, in its judgment, will remove such advantage, preference, prejudice or discrimination, * * * the law of any state or the decision or order of any state authority to the contrary notwithstanding.'

"This section of the Transportation Act, which was not in existence when the constitutionality of the Arkansas full switching law and extra brakeman act were passed upon by the Supreme Court of the United States, clearly shows that Congress, since those decisions, has occupied the field, thus nullifying the state power upon this subject.

"By section 15 of the Act to Regulate Commerce, as amended February 28, 1920, the Interstate Commerce Commission is given complete authority to determine rates, classifications, regulations and practices, and the Commission is given authority to prescribe what will be 'a just and reasonable rate, fare, charge, thereafter to be observed,' and what 'individual or joint classification, regulation or practice is or will be just, fair and reasonable to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds that the same does or will exist * * * and the carriers shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.'

"The Interstate Commerce Commission, by section 15, paragraph 6, in prescribing the rates and practices to be followed by interstate carriers, is directed by Congress as follows:

" 'In so prescribing and determining the divisions of joint rates, fares and charges, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operating, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers, and also whether any particular participating carrier is an originating, intermediate or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier to the joint rate, fare or charge.'

"Section 15a, paragraph 2, further provides as follows:

" 'In the exercise of its power to prescribe just and reasonable rates the Commission shall initiate, modify, establish or adjust such rates so that carriers as a whole, or as a whole in each of such rate groups, will, under honest, efficient and economical management and reasonable expenditures for maintenance of way, structure and equipment, earn and aggregate net annual operating income equal, as nearly as may be, to a fair return upon the aggregate value of the railway property,' etc.

"By these sections the Commission is given authority, not only to fix the rates so as to provide a reasonable return upon the property, but also to regulate the expenditures consistent with proper, efficient operation and economical management. If the Interstate Commerce Commission has authority to prescribe the rates and to regulate the expenditures, then the State of Arkansas, or any other individual state, cannot uselessly require, under the guise of the police power, an annual expenditure by the carriers of this state of the sum of $1,000,000.00, which is not required by any other of the eight states through which the petitioner operates, for compliance with the so-called full crew laws.

"XII. Conflict with Railroad Labor Act.

"Congress has also legislated upon the complete subject of railway labor by providing for a board of mediation and an emergency board, if necessary, to consider and act upon all disputes and issues between railroad employes and the common carriers of this country that they do not settle themselves.

"The Railroad Labor Act of 1926 provides that it shall be the duty of all carriers, their officers, agents and employes, to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes. Conferences are provided for 'in case of a dispute between a carrier and its employes arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions.'

"Congress, by the Railroad Labor Act, has given the United States Board of Mediation jurisdiction to consider and act upon any and all disputes, and not only to consider reasonable rules and working conditions, but also, when arbitration is had, the decision of the arbitrators as to proper 'working conditions' between railroad employes and common carriers is binding between both parties.

"Plaintiff avers that by said Railroad Labor Act Congress intended to leave the railroad common carriers of the United States and their employes free to handle questions pertaining to rules and working conditions, as in said Railroad Labor Act provided, and intended that if they agreed to arbitrate under said act any controversies or disputes with respect to rules and working conditions,

the judgment of the Arbitrators should not be limited in any way other than by federal statutes, and intended that any judgments on awards entered pursuant to provisions of said act should not be affected or disturbed in any way by any state statute or any order of any state administrative body theretofore or thereafter passed or entered. The Arkansas extra switchmen act and extra brakemen law is therefore void because in conflict and inconsistent with the said United States Railroad Labor Act of 1926."

The rule seems to require clear language to accomplish the results here sought, for it is said in Napier v. Atlantic Coast Line R. R. Co., 272 U. S. 605, 611, 47 S. Ct. 207, 209, 71 L. Ed. 432: "The intention of Congress to exclude states from exerting their police power must be clearly manifested. Reid v. Colorado, 187 U. S. 137, 148, 23 S. Ct. 92, 47 L. Ed. 108; Savage v. Jones, 225 U. S. 501, 533, 32 S. Ct. 715, 56 L. Ed. 1182." In the light of this rule, do the several matters included in the above contentions of plaintiff, or any one of them, make clearly manifest any intention of Congress to abrogate the power of a sovereign state to exercise its police power in the matter of requiring extra brakemen and extra switchmen?

The Transportation Act of 1920 (41 Stat. 456) " 'introduced into the federal legislation a new railroad policy.' New England Divisions Case, 261 U. S. 184, 189, 43 S. Ct. 270, 273, 67 L. Ed. 605; R. R. Comm. v. C., B. & Q. R. R. Co., 257 U. S. 563, 585, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086. The purpose of this policy is repeatedly expressed in the act (sections 402, 407, 422 [49 USCA §§ 1, 5, 15a; Comp. St. §§ 8563, 8567, 8583a]) and may be stated in the language used in section 402 as being to 'best promote the service in the interest of the public and the commerce of the people.' An important feature of the means to accomplish such purpose was 'affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country' (Dayton-Goose Creek Ry. Co. v. U. S., 263 U. S. 456, 478, 44 S. Ct. 169, 172, 68 L. Ed. 388, 33 A. L. R. 472) so as 'to insure * * * adequate transportation service' (New England Divisions Case, 261 U. S. 184, 189, 43 S. Ct. 270, 273, 67 L. Ed. 605)." Missouri-Kansas-Texas R. Co. v. Northern Okla. Rys. (C. C. A.) 25 F.(2d) 689, 690.

While the act declared this ambitious purpose and the construing decisions have recognized and striven to give full effect thereto, yet the act did not grant any "blanket" au-

thority to the commission to effectuate such purpose. On the contrary, Congress specified the character of matters committed to the commission. It appeared, in the argument, that a respectable number of the states had (and yet have) legislation directly upon the matters here involved, and the validity of such legislation had been established (Chicago, R. I. & P. R. Co. v. Arkansas, 219 U. S. 453, 31 S. Ct. 275, 55 L. Ed. 290; St. Louis, I. M. & S. R. Co. v. Arkansas, 240 U. S. 518, 36 S. Ct. 443, 60 L. Ed. 776) at the time this act was under consideration by Congress. We should therefore expect that Congress would use fairly clear language if it intended to take that field away from the states. Nowhere in that act is there a specifically expressed grant to the commission of power to control the number of employees to be used by a carrier in the movement of its trains or cars in interstate commerce. If such a grant is in the act, it must be construed to lie within some more general expressions. Plaintiff points out such expressions which it contends should be so construed. Those are found in that part of the act which amended the then existing Interstate Commerce Act (as amended).

One expression relied upon is the word "practice." This word, standing alone, is vague. It has been defined as "Frequent and repeated exercise in any matter." Standard Dictionary. Its outline becomes definite only when associated with other definite ideas. Even as associated with the jurisdiction of the Interstate Commerce Commission, as expressed in the act to regulate commerce as amended in 1910, the Supreme Court has said of the word, "Regarding only its broad generality anything may be asserted of it" (United States v. Penn R. R. Co., 242 U. S. 208, 228, 37 S. Ct. 95, 101, 41 L. Ed. 251) and "considered generally and without regard to context, [it] is not capable of useful construction. If broadly used, it would cover everything carriers are accustomed to do" (Baltimore & O. R. R. Co. v. U. S., 277 U. S. 291, 299, 48 S. Ct. 520, 522, 72 L. Ed. 885). Mr. Justice Butler then declares the rule, for construing this word when used in the commerce act, to be that "Congress will be deemed to have intended to confine its application to acts or things belonging to the same general class as those meant by the words associated with it." Baltimore & O. R. R. Co. v. U. S., 277 U. S. 291, 300, 48 S. Ct. 520, 522, 72 L. Ed. 885.

As originally enacted the Interstate Commerce Act (act to regulate commerce, Feb-

ruary 4, 1887, 24 Stat. 379) did not contain the words "practice" or "practices." Prior to the Transportation Act of 1920, those words came in, by amendments to that àct, only in sections 1 and 15. Section 15 was so amended by the Act of June 29, 1906, § 4 (34 Stat. 584, 589) and of Act June 18, 1910, § 12 (36 Stat. 539, 552). Section 1 was so amended by the Act of June 18, 1910, § 7 (36 Stat. 539, 546) and of Act May 29, 1917 (40 Stat. 101). In the Transportation Act 1920 the expression appears in amendments to section 1 (41 Stat. 456 at 475 and 476), to section 13 (41 Stat. 456 at 484), to section 15 (41 Stat. 456, at 485, 486 and 487), and in the new section 15a (41 Stat. 456 at 488).

Plaintiff mainly relies upon the use of the expression in sections 13, 15, and 15a of the Transportation Act 1920, although the use in section 1 was adverted to in argument. We will take the sections up in the order: Sections 13, 15, 15a, and 1 (49 USCA §§ 13, 15, 15a, and 1).

Section 13 deals with complaints to and investigations by the commission. Up to the Transportation Act 1920, it consisted of two unnumbered subdivisions. The Transportation Act 1920 (41 Stat. 456, 484) gave those subdivisions numbers, (1) and (2), and added thereto two new subdivisions, (3) and (4). Before the Transportation Act 1920, there had been but one act (Act June 18, 1910, § 11, 36 Stat. 539, 550) amending this section. The amendment of 1910 was confined to adding "any common carrier" as a complainant and to clarifying the statement as to the right and powers of the commission to initiate investigations. The expressions theretofore used are the same now found in subdivisions (1) and (2), wherein the commission is empowered to determine complaints "of anything done or omitted to be done by any common carrier subject to the provisions of this Act, in contravention of the provisions thereof" or to initiate investigations "as to any matter or thing concerning which a complaint is authorized to be made, to or before said commission by any provision of this Act, or concerning which any question may arise under any of the provisions of this Act, or relating to the enforcement of any of the provisions of this Act" (36 Stat. 539, 550, 551). The word "practice" did not appear in the section prior to the Transportation Act 1920 and, therein, only in subdivisions (3) and (4) which were new in that act. Those two new subdivisions (italics ours) are as follows (41 Stat. 484):

"(3) Whenever in any investigation under the provisions of this Act, or in any investigation instituted upon petition of the carrier concerned, which petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or *practice*, made or imposed by authority of any State, or initiated by the President during the period of Federal control, the Commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding. The Commission may confer with the authorities of any State having regulatory jurisdiction over the class of persons and corporations subject to this Act with respect to the relationship between rate structures and *practices* of carriers subject to the jurisdiction of such State bodies and of the Commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings with any such State regulating bodies on any matters wherein the Commission is empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the Commission. The Commission is also authorized to avail itself of the co-operation, services, records, and facilities of such State authorities in the enforcement of any provision of this Act.

"(4) Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or *practice* causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or *practice* thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and *practices* shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding."

The scope and purposes of these two subdivisions are revealed in the expressions used therein. They are parts of one legislative

idea which is to declare unlawful "any rate, fare, charge, classification, regulation, or practice, made or imposed by authority of any State, or initiated by the President during the period of Federal control" (subdivision (3) which "causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce" (subdivision (4); and to provide the method of enforcing that prohibition. That method is to lodge jurisdiction in the commission to make such investigations and orders thereon, which orders shall be controlling. As a matter of comity and fairness, the commission is required to notify the state affected so that it may be represented at the hearing. As a matter of comity and possible aid to the commission, it is empowered to confer with and hold joint meetings with the proper state authorities and to avail itself of the information, etc., of such authorities. Subdivision (4) is really the main one of the two subdivisions, while (3) is largely, if not entirely, procedural. The revealed purpose of these subdivisions is to prevent discriminations favorable to intrastate commerce at the expense and to the detriment of interstate commerce. Such discriminations had arisen before the Transportation Act 1920 and had been condemned by the Supreme Court in the Shreveport Case (Houston, E. & W. Texas Ry. Co. v. U. S., 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341) and the Minnesota Rate Cases (230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18). It was to enact into statutory law and affirm the jurisdiction of the commission in such matters that these two subdivisions were inserted in the Transportation Act. The matters treated in the above cases were intrastate rates fixed by state authority. The main purpose Congress had in mind was rates or matters affecting rates—classifications, rules, regulations, practices. This is clearly revealed in the report of the Committee to the House of Representatives (66th Cong. H. R. Report 456) where, in discussing this feature of the Bill, it was said:

"*Adjusting Conflicts Between Inter and Intra State Rates.*—Whenever, in any investigation under the provisions of the Commerce Act, or in any investigation instituted upon petition of the carrier concerned, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice made or imposed by authority of any State,

the commission (sec. 445) before proceeding to hear and dispose of such issue shall cause such State or States to be notified of the proceeding. The commission can ask the State regulatory body to 'sit in' with it and hold joint hearings and to avail itself of the cooperation, services, records, and facilities of such State authorities. After such hearing the Commission shall make such findings and orders as may in its judgment tend to remove any undue advantage, preference or prejudice as between persons or localities in State and interstate or foreign commerce. The provision practically enacts into law the decision of the Supreme Court in the so-called 'Shreveport' case. Any undue burden upon interstate or foreign commerce is forbidden and declared to be unlawful. It is believed that the provisions of this section will have a beneficial and harmonizing effect and will tend to reduce the number of so-called 'Shreveport' cases, while at the same time recognizing the regulatory bodies of the several States." H. Rep. 456, p. 20.

"*Control of Commission over intrastate rates.*—Section 415 [416] amends section 13 of the commerce act in such a manner as to require the commission when considering the relation between the intrastate rate and the interstate rate to give notice to the State affected. The commission is authorized to confer with the proper State regulatory body and to hold joint hearings. The commission is given power, after full hearing, to make such orders as may in its judgment tend to remove any undue advantage, prejudice, or preference as between persons or localities in State, interstate, or foreign commerce, respectively, or any undue burden upon interstate or foreign commerce." H. Rep. 456, p. 29.

Also see statement of Senator Cummins in explanation of the bill (59 Cong. Rec. 142, 143). It may be that the words "regulation, or practice," should not be narrowly confined to such as are directly related to rates, but it is certain that Congress had no thought of including matters such as are involved in this action. This is true for two reasons: First, such words are used in connection with others —"rate, fare, charge, classification"—which refer exclusively to rates and, therefore, are to be construed in that connection. Baltimore & O. R. R. Co. v. U. S., 277 U. S. 291, 299, 300, 48 S. Ct. 520, 72 L. Ed. 885. Second, these subdivisions of the section refer only to practices which tend unduly to discriminate in favor of intrastate commerce and against interstate and foreign commerce

—here, all commerce is equally affected and in the same manner by these state statutes.

Plaintiff relies upon the same expression as used in section 15 as amended by section 418 of the Transportation Act 1920 (41 Stat. 456, 484–487). That expression first came into this section by the amendment of June 29, 1906, § 4 (34 Stat. 584, 589), and further by the amendment of June 18, 1910, § 12 (36 Stat. 539, 551). As originally enacted (24 Stat. 379, 384), this section was a single paragraph and provided for a "cease and desist" or "reparation" order by the commission. The power there given was one of negation as to "anything * * * done or omitted to be done [by the carrier] in violation of the provisions of this act, or of any law cognizable by said Commission." Besides broadening the power of the commission in respects not here material, the act of 1906 amended the existing paragraph of the act to regulate commerce. Instead of the above-quoted general language ("anything * * * done or omitted to be done," etc.), the amendment substituted "any of the rates, or charges whatsoever, demanded, charged, or collected * * * or that any regulations or practices whatsoever of such carrier or carriers affecting such rates, * * *" and gave the commission power to act affirmatively by determining and prescribing a just rate "and what regulation or practice in, respect to such transportation is just, fair, and reasonable to be thereafter followed." The above is the first appearance of the words "practice" or "practices" in the Interstate Commerce (act to regulate commerce) Act. Obviously, it relates only to voluntary practices by the carrier which improperly affect rates. The amendment of 1910 did not depart from this meaning of the words "practice" or "practices" as used in the section. It speaks of rates and of "classifications, regulations, or practices" which are found to be "unjust or unreasonable or unjustly discriminatory, or unduly preferential or prejudicial or otherwise in violation of any of the provisions of this Act" (36 Stat. at 551). In the next paragraph (new in the amendment) relating to filing of tariffs, etc., the meaning of the words is emphasized. That paragraph starts with, "Whenever there shall be filed with the commission any schedule stating a new individual or joint rate, fare, or charge, * * * or any new individual or joint regulation or practice affecting any rate, fare, or charge," and thereafter uses the word "practice" six times in the same connection. The position of these two paragraphs would seem to indicate that the words were intended to be used in both in reference only to rates. However, the use in the first paragraph, considered alone, is rather broad and the expressions in the report of the Committee to the House of Representatives (H. R. Report 923, pp. 10, 82–84, 61st Cong. 2nd Sess.) indicate a wider meaning. But even the committee report does not carry the meaning beyond "practices" originated by the carriers. The amendments to this section by the Transportation Act 1920, §§ 418–421 (41 Stat. 456 at 484–488), obviously, do not broaden the meaning of the words as they existed in the section before those amendments.

The word "practices" occurs once in section 15a (41 Stat. 456, 488), which is a new section added by the Transportation Act 1920. The use there occurs in a definition of "rates." is expressly limited to practices "relating" to "rates, fares, and charges," and, plainly, refers only to such as are originated by the carriers.

Counsel, in argument, call attention to the same words in amendments to section 1 made by the Transportation Act 1920 (41 Stat. 456 at 475, 476). The amendment there refers to two separate matters. The first occurs in section 400 of the Transportation Act (41 Stat. at 475) and clearly is confined to such as are originated by the carrier in connection with "the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this Act." The second occurs in section 402 of the Transportation Act 1920 (41 Stat. at 476) and refers solely to "car service."

The conclusion is that the words "practice" or "practices," as used in the Transportation Act 1920, are, when given their broadest permissible meaning, confined to such as are originated by the carrier or such as result in discrimination in favor of intrastate commerce as against interstate or foreign commerce.

Counsel rely, also, upon a provision in the new section 15a, added by the Transportation Act 1920. This is the "recapture of earnings" section. Subdivision (3) thereof, dealing with the determination by the commission of the rate of return on value, requires consideration to be given "to the transportation needs of the country and the necessity (under honest, efficient and economical management of existing transportation facilities) of enlarging such facilities in order to provide * * * adequate transportation." The provision stressed here is "*economical* management." The argument is that the Arkansas statutes require unnecessary,

...

and therefore wasteful, expenditures; that the above provision gives the commission the power to confine management to "economical" measures, and therefore Congress has occupied the field of controlling matters interfering with such economical management. The logical result of this contention, as to grant of power to the commission, is that Congress conferred the power to supervise carrier expenditures—at least, to the extent of preventing waste or improvidence. The power to do this *directly* would be a decided step in advance of any congressional action before the Transportation Act. This subdivision of this section deals with just one main subject. That subject is the rate of return on property value to be determined and allowed the carriers by the commission. As an element in such determination, the transportation needs of the country are to be considered by the commission. The expression relied upon here occurs only in connection with the consideration of "the necessity * * * of enlarging such [transportation] facilities." In that connection, the commission is to consider the honesty, efficiency, and economy "of existing transportation facilities." Such provision gives no power of directly supervising carrier expenditures. It provides control *only* through the rate of return allowed by the commission. Also, it clearly is aimed only at voluntary expenditures by the carrier.

Counsel rely upon certain expressions by Senators Cummins (Cong. Rec. 59, p. 396) and Robinson (same, pp. 3331, 3332, and 3334) as sustaining their view. Other expressions show, more clearly, the thought to be that if a carrier, having large net earnings and knowing it could, under section 15a, retain only a part thereof, should seek to use such excess earnings in exorbitant wages or other wasteful expenditures, the commission might make such action inadvisable by considering such in estimating the proper excess earnings to be turned over to the government as trustee; in short, such could be thrown back on the corporation to the loss of its stockholders. There is no suggestion in the section as enacted, in the committee reports or in the congressional debates of any direct control by the commission of any expenditures of the carriers, and indirect control is suggested only as to such expenditures as are voluntarily made by the carrier.

### Labor Act of 1926.

Plaintiff contends that Congress has occupied the field of these Arkansas statutes in the Labor Act of 1926 (44 Stat. 577 [45 US CA §§ 151–163]). It is argued that Congress, in that act, took over control of "working conditions" of employees of interstate carriers and that "working conditions," as there used, includes the number of men required in train and switching crews. In a sense, the number of men required to perform a task is one of the "working conditions" of that task. However, such meaning is not necessarily included in such expression. Therefore, it is necessary to construe this act to determine if such meaning is to be found therein. This act is the latest of a line of congressional legislation having the same general purpose. Prior acts are the Act of June 1, 1898 (30 Stat. 424), Act of July 15, 1913 (38 Stat. 103 [45 USCA §§ 101–125]), and the Transportation Act of 1920, §§ 300–316 (41 Stat. 456, 469 [45 USCA §§ 131–146]). The purpose of each of these acts was to prevent interruption of interstate commerce by strikes or lockouts resulting from disputes between carriers and their employees. The general method of each of these acts is to provide a medium or machinery for peaceful, orderly settlement of such disputes. In each the subject-matter of dispute is defined in general terms; these terms are similar in all of the acts. The Acts of 1898 (30 Stat. 424, 425) and of 1913 (38 Stat. 103, 104) include in such definition "conditions of employment." The Transportation Act (41 Stat. 456, 470, 471) includes "working conditions" and "standards of working conditions." The Labor Act of 1926 (44 Stat. 577, 578, 580, 582) includes "working conditions." Obviously, these terms in each of these acts have the same general meaning. They mean such conditions affecting the work of the employees as might be the subject of agreement between the carriers and the employees. This could not include matters of statutory duty, for such are withdrawn from the volition of either party. Also, if Congress intended to occupy the field in the Labor Act of 1926, it had already, by the use of similar language, done so in 1898, yet the Supreme Court, in 1911 (Chicago, R. I. & P. R. Co. v. Arkansas, 219 U. S. 453, 31 S. Ct. 275, 55 L. Ed. 290) and 1916 (St. Louis, I. M. & S. R. Co. v. Arkansas, 240 U. S. 518, 36 S. Ct. 443, 60 L. Ed. 776) decided these very statutes of Arkansas were in a field not occupied by national legislation.

### Conclusion.

Our conclusion is that the petition states no cause of action, and, for that reason, the motion to dismiss should be sustained and the cause dismissed, and it is so ordered.