274 F.Supp. 294 (1967)
CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, the Kansas City Southern Railway Company, Missouri Pacific Railroad Company, St. Louis-San Francisco Railway Company, St. Louis Southwestern Railway Company, and the Texas and Pacific Railway Company, Plaintiffs,
v.
Robert N. HARDIN, Prosecuting Attorney for the Seventh Judicial Circuit of Arkansas, and W. F. Denman, Jr., Prosecuting Attorney, for the Eighth Judicial Circuit of Arkansas, Defendants, and
Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, Brotherhood of Railroad Trainmen, Order of Railway Conductors and Brakemen, and Switchmen's Union of North America, Intervenors.
Civ. No. H.S. 944.
United States District Court W. D. Arkansas, Hot Springs Division.
October 3, 1967.
*295 *296 Robert V. Light, Little Rock, Ark., Martin M. Lucente, Chicago, Ill., for plaintiffs.
Joe Purcell, Atty. Gen., State of Arkansas and Jack Lessenberry, Little Rock, Ark., for defendants.
John P. Sizemore, Robert D. Ross, Little Rock, Ark., for intervenors.
Before VAN OOSTERHOUT, Circuit Judge, and MILLER and HENLEY, District Judges.
HENLEY, District Judge.

Memorandum Opinion
By this suit in equity interstate rail carriers operating in and through Arkansas challenge once again the constitutional validity of two Arkansas statutes prescribing minimum crew consists for freight trains in road and yard service. The two statutes are Act 116 of 1907, Ark.Stats., Ann., § 73-720 et seq. and Act 67 of 1913, Ark.Stats., Ann., § 73-726 et seq. Plaintiffs seek a declaration that the statutes are violative of the Due Process and Equal Protection Clauses of the 14th Amendment to the Constitution of the United States and of the Commerce Clause itself, U. S. Constitution, Art. I, section 8, Clause 3, and they seek an injunction against continued enforcement of the statutes. The defendants are two Arkansas Prosecuting Attorneys; five railroad Brotherhoods representing certain classifications of railroad employees have been permitted to intervene and to align themselves with the defendants. The case has been heard by a District Court of three judges, and this opinion incorporates the Court's findings of fact and conclusions of law.
The suit, filed in April 1964, seems to have been inspired by developments in the railroad industry in the last thirty or so years and by the fact that in 1963, to avert a threatened national strike of railroad workers, Congress adopted the Joint Resolution of August 28, 1963, P.L. 88-108, 77 Stat. 129, which provided in substance that the serious dispute between the rail carriers and the Brotherhoods about crew consists should be resolved by arbitration with the award to be binding for a period of not more than two years. Pursuant to that Resolution there was created Arbitration Board No. 282 made up of representatives of railroad management, the Brotherhoods, and the public. In November 1963 that Board made a basic award to go into effect in 1964 and to expire in November 1965; that award permitted the carriers to make substantial reductions in consists of crews both in road and yard service.
In their original complaint plaintiffs alleged, in addition to their constitutional contentions, that the passage of P.L. 88-108 and the award of Arbitration Board No. 282 amounted to a federal preemption of the field of crew consists.
In the fall of 1964 plaintiffs filed a motion for summary judgment based in part on the pre-emption contention. A majority of this Court sustained the motion on that ground without reaching the constitutional questions posed by the complaint. Chicago, R. I. & P. R. Co. v. Hardin, W.D.Ark., 239 F.Supp. 1.
Defendants and intervenors appealed to the Supreme Court of the United States, and the judgment of this Court was stayed about three weeks after it was entered. The Supreme Court reversed our decision and remanded the case for consideration of the constitutional questions on the merits. Brotherhood of Railroad Locomotive Engineers v. Chicago, R. I. & P. R. Co. (Hardin v. Chicago, R. I. & P. R. Co.), 382 U.S. 423, 86 S.Ct. 594, 15 L.Ed.2d 501.
Act 116 provides in substance that all freight trains in road service operated on railroads fifty miles or more in length and consisting of twenty-five cars or more must be manned by a crew consisting of not less than one engineer, one fireman, one conductor, and three brakemen. Act 67 provides that railroads one hundred miles or more in length conducting switching operations over public crossings in first and second class cities in Arkansas must utilize crews consisting of not less than one engineer, one fireman, one foreman, and three helpers. Substantial pecuniary penalties *297 are prescribed for violations of the respective statutes.
When those statutes were passed, all locomotives were powered by steam. In those days engineers, conductors, foremen, and firemen were indispensable crew members in road and switching operations. Hence, the practical effect of the statutes was to require the affected railroads to employ an "extra brakeman" and an "extra helper", depending upon the nature of the operation.
Over a period beginning in 1907 and ending in 1933 different rail carriers on three occasions attacked the validity of the statutes without success. Claims that the enactments violated the 14th Amendment, the Commerce Clause, the Interstate Commmerce Act, and the Railway Labor Act were successively rejected. Chicago, Rock Island & P. R. Co. v. State, 86 Ark. 412, 111 S.W. 456, aff'd 219 U.S. 453; St. Louis, I. M. & S. R. Co. v. State, 114 Ark. 486, 170 S.W. 580, aff'd 240 U.S. 518, 36 S.Ct. 443, 60 L.Ed. 776; Missouri Pacific R. Co. v. Norwood, W.D. Ark., 42 F.2d 765, aff'd but with leave to amend complaint, 283 U.S. 249, 51 S.Ct. 458, 75 L.Ed. 1010, 283 U.S. 809, 51 S.Ct. 652, 75 L.Ed. 1428, decided on merits, 13 F.Supp. 24, aff'd per curiam, 290 U.S. 600, 54 S.Ct. 227, 78 L.Ed. 527.
In that series of cases the statutes were authoritatively characterized as safety measures and were upheld as such. While the Courts recognized that the relationship and significance to safety of operations of fixed crew consists were questionable, the Courts on the records before them were not able to say that the statutory requirements were not reasonable and permissible police regulations.
In the Norwood case in particular the plaintiff carrier contended that changes in railroad equipment and operations in the years which had followed the adoption of the statutes had been such as to deprive them of their validity, and that they should be declared unconstitutional on the basis of changed conditions. In its decision on the merits, 13 F.Supp. 24, the District Court recognized that there had been many material changes in the railroad industry, and it discussed them in great detail. However, the Court was not persuaded that the changes had been so great or significant as to render unconstitutional the continued enforcement of the statutes. And in its affirming per curiam opinion the Supreme Court "[saw] no reason to disagree with the determinations of fact reached by the District Court." 290 U.S. 600, 54 S.Ct. 227.
In the instant case plaintiffs now contend that changes in the industry which have taken place since Norwood have rendered the statutes obsolete and irrelevant as far as railroad safety is concerned, and that if they did not do so before, the statutes now amount to violations of the Due Process and Equal Protection Clauses, and that they discriminate against interstate commerce and are an unconstitutional burden of that commerce.
Countering those contentions the defendants and intervenors, while admitting that there have been changes and improvements relevant to safety of operations, deny that those changes have been as far reaching and significant as plaintiffs contend, and deny that the improvements have been universally and uniformly adopted by the carriers; they also contend that railroad operations today present hazards that did not exist when Norwood and the other earlier cases were decided; and they challenge the cost figures of the carriers. They say that even after giving full weight to the changes and improvements the question of the reasonableness of the statutes as safety measures still remains fairly debatable and that this Court should not substitute its judgment for the judgment of the Arkansas Legislature.[1]
Alternatively, defendants and intervenors contend that even if the statutes have lost their significance as safety *298 measures, they are still sustainable as "economic legislation," and they cite in that connection a line of cases beginning with West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, and apparently ending with Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336. We dispose of this alternative contention at this point by observing that the statutes have been characterized as safety measures and nothing else. We accept the characterization of the earlier decisions and find it unnecessary to decide whether the statutes are sustainable on some other basis.[2]
As has been seen, the Arkansas statutes have been upheld by the Supreme Court of the United States, with the Norwood litigation being terminated finally in 1933. In view of the judicial history of the statutes, it is necessary for us to determine what issues are open to us here and to what extent our inquiries are foreclosed by the earlier adjudications. The plaintiffs say that all issues are open for consideration in the light of changed conditions. Defendants and intervenors say that all issues are foreclosed, except the contention based on the Due Process Clause.
In connection with their appeal from our order granting summary judgment in the case, defendants and intervenors argued in the Supreme Court that the constitutional issues tendered by plaintiffs are insubstantial. That Court rejected that contention. We have read the opinion of the Court very carefully and are persuaded that no issues raised by the pleadings and the evidence are "foreclosed" by the earlier decisions. While we consider the issues against the backdrop of the former cases, we must consider them in the light of present day conditions and in the light of the additional experience with and insights into crew consists in relation to safety of operations which have been gained in the thirty-four years which have elapsed since Norwood was finally decided.
As materials of record reflect, the proper manning of freight trains has been a source of controversy between the carriers and the Brotherhoods for many years, and the problem has become one of increasing urgency as time has gone by. It has been the subject of collective bargaining, of studies by representative groups, of legislation and of arbitration. Naturally, as the transportation industry has become more efficient and competitive, and as equipment and technology have improved, the carriers have sought to operate without unnecessary personnel. Equally naturally, the great railroad Brotherhoods have sought to protect insofar as possible the jobs of their members. Generally, the railroads have desired to reduce crews in road and yard service, and particularly to eliminate firemen on diesel locomotives, which have now universally supplanted steam power, and to eliminate the third brakeman and third helper. The Brotherhoods, on the other hand, have desired to maintain existing crew levels or even, in instances, to increase them.
As time has gone by, there have been many historical developments in the railroad industry related to the problem of freight and switching crew consists. Bargaining has taken place, demands and counter-demands have been made, strikes have been threatened, studies and reports have been made, and there have been arbitration awards under which the carriers and the Brotherhoods have operated for substantial periods of time.
It would prolong this opinion unduly and would be a duplication of effort to undertake to outline those historical developments here in any detail. Adequate historical statements will be found in the opinion of the Supreme Court in this case; in the 1960 Report of the Public Service Commission of the State of New York dealing with the full crew laws of that State; in the 1962 Report of the Presidential Commission On Railroads; and in the Report of the Royal Commission on Employment of Firemen on *299 Diesel Locomotives in Freight and Yard Service on the Canadian Pacific Railway. Regardless of the validity of the opinions expressed and the conclusions reached in those reports, there can be no question that most of the factual material set out in them is accurate. Indeed, many of the facts set forth in the reports could be the subject of judicial notice.
As pointed out in the report of the Presidential Commission, full crew legislation was the product of the late 19th and early 20th century; with a few exceptions no full crew legislation has been passed since 1920. As of January 1, 1967, fifteen States, including Arkansas, had full crew legislation with respect to passenger trains.[3] Six States besides Arkansas had full crew requirements of some sort for freight trains in road service. Four States in addition to Arkansas had similar requirements for switching crews. Seven States have authorized their regulatory agencies to make full crew requirements, but in four of those States no requirements have been made. Twenty-seven States have neither legislated on the subject nor authorized consistent requirements to be made by regulatory bodies.
The Arkansas requirement that six man crews be employed in all road and switching operations is the most arduous of all of the existing full crew requirements. Of the other full crew States only Indiana requires the employment of as many as six men, and Indiana's requirement is limited to longer trains.
All of the plaintiffs here are Class I railroads. All of them employ diesel-electric locomotives in their operations; none uses steam power. All of the plaintiffs are subject to both of the Arkansas statutes.[4] In none of the States bordering Arkansas are there full crew requirements which affect plaintiffs, and in all of those bordering States plaintiffs operate with crews of less than six men.
There are seventeen short line carriers in Arkansas which are not affected by the statutes. Their crew consists are determined by managerial decision or by collective bargaining. They operate with varying crews of from two to six men. There are also industrial and military railroads in the State which operate with crews of less than six. The tracks of the short line carriers, of the industrial railroads, and of the military railroads connect with the interstate lines of one or more of the plaintiffs, and the same equipment which moves on the long lines moves on the short ones.
With the foregoing by way of background, we approach now the merits of the controversy. The governing legal principles are clear and, indeed, are not substantially disputed:
In the absence of controlling federal enactments the State of Arkansas is free, subject to the limitations of the Commerce Clause, the Due Process Clause, and the Equal Protection Clause, in the exercise of its police power to legislate in the interest of safety of railroad operations even though its legislation may affect interstate commerce.
As far as the Due Process Clause is concerned, the statutes are not unconstitutional if their requirements are reasonably related to safety of operations, and if they are not unduly oppressive, restrictive, or costly in comparison with the safety benefits achieved. See, in addition to the cases involving the Arkansas statutes: Goldblatt v. Town of Hempstead, 369 U.S. 590, 594-595, 82 S.Ct. 987, 8 L.Ed.2d 130; Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385; Weinberg v. Northern Pacific Ry. Co., 8 Cir., 150 F.2d 645.
If the reasonableness of the requirements of the statutes remains fairly debatable, this Court will not substitute its views for those of the Legislature; *300 we do not sit to exercise "legislative judgment." United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234; South Carolina State Highway Commission v. Barnwell Brothers, Inc., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734; Standard Oil Co. v. City of Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856; Weinberg v. Northern Pacific R. Co., supra.
As to the Commerce Clause, it goes without saying that Arkansas may not lawfully discriminate against interstate commerce, nor may the State unreasonably burden that commerce. With respect to the burdening of interstate commerce it should be pointed out that the Commerce Clause and the Due Process Clause are not exactly co-extensive. A State regulatory statute which may survive a due process attack may fall before the Commerce Clause. Bibb v. Navajo Freight Lines, 359 U.S. 520, 529, 79 S.Ct. 962, 3 L.Ed.2d 1003.
In the absence of ruling federal legislation or regulatory action, a State is free to adopt local safety legislation which may affect interstate commerce, provided that the enactment serves a real and legitimate purpose and is not unduly burdensome on that commerce. But, the general rule is that State regulation which interferes with the free flow of interstate commerce or which materially affects it in areas where uniformity of regulation is required, is invalid under the Commerce Clause. Morgan v. Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317; Southern Pacific Co. v. State of Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915.
At times, a State safety statute may have a distinct impact on interstate commerce, and when such a situation arises, there must be a judicial balancing of the legitimate State interest against the national interest in the flow of interstate commerce free from local regulation. Bibb v. Navajo Freight Lines, supra; Southern Pacific Co. v. State of Arizona, supra.
The Arkansas statutes are presumed to be valid as against both the 14th Amendment and Commerce Clause attacks. Bibb v. Navajo Freight Lines, supra, 359 U.S. at 529, 79 S.Ct. 962. The burden is upon the plaintiffs to establish the invalidity of the statutes, and if upon a consideration of the whole record a reasonable doubt upon the question remains, that doubt must be resolved in favor of the validity of the statutes.
The record before us is extremely voluminous. It includes oral testimony, sworn statements, depositions, statistical material, documentary evidence, copies of various public documents, photographs, and motion picture film. We make no effort to discuss the evidence in detail. If the mass of material put into the record by the parties, and we suspect that much that was put in is surplusage, is to be evaluated properly, it is necessary for us to define clearly the controlling issue before us.
That issue is whether under present railroad operating conditions the minimum six man crew requirements of the two Arkansas full crew statutes remain as valid exercises of the State's police power in the field of railroad safety or whether they now amount to arbitrary requirements which are unreasonable, oppressive and unduly burdensome on interstate commerce.[5]
It is important to keep in mind that we are concerned with the specific consist requirements which Arkansas has seen fit to make. We are not directly concerned with the requirements of the other full crew States, and we are not concerned with other requirements which the Arkansas Legislature might have made had it chosen to do so.
We are dealing here with railroad safety, and in the field of railroading "safety" is a highly relative term. Pennsylvania R. Co. v. Driscoll, 336 Pa. 310, *301 9 A.2d 621. Railroading is an inherently dangerous business whether it is carried on in Arkansas, Missouri, New York, or California. As long as railroads operate and as long as human beings are fallible, there are going to be railroad accidents. There are many causes of such accidents. Some types of accidents may be connected proximately to railroad crew consists; many other types cannot be so connected. A railroad hazard which cannot be avoided or mitigated by having a particular number of men on a train or in a switching crew, is not relevant in this case. On the other hand, it is only fair to say that an improvement in railroad equipment or operating methods which does not eliminate or substantially eliminate the need for one or more men to perform a necessary safety function is equally irrelevant. Speed and efficiency of railroad operations cannot be equated entirely with safety of operations; however, it cannot be said accurately that safety of operations may not frequently be related to efficiency and speed of operations.
There is no question that since the Norwood decision great changes and improvements in railroad equipment and operating methods have been made, which changes and improvements have contributed largely to safety of operations.
The diesel locomotive has entirely displaced steam power, and the design and appearance of a diesel locomotive differ greatly from those of a steam locomotive. A diesel locomotive is a much more efficient piece of machinery than a steam locomotive, and is so designed and arranged as to require much less human effort in servicing the locomotive and making adjustments while the train is in motion. Almost all necessary adjustments that can be made while the locomotive is in operation are made by manipulating switches and buttons.
There have been great improvements in cars, couplers, brakes, tracks, roadbeds, and switches. There have been new and improved signals and traffic control devices designed and installed. Communications from one end of a freight train to the other and from the train to points outside the train have been revolutionized by the development of the two-way radio telephone. There are others which might be mentioned. Operating methods have changed also so that the duties of crew members are less arduous than they were thirty years ago.
The diesel locomotive began to be used in road service in the 1930's and its adoption progressed steadily in the post-Norwood years, except to the extent that it may have been slowed down temporarily during World War II.
Prior to 1937 some carriers used firemen on diesel locomotives; others did not. In that year the Brotherhood of Locomotive Firemen and Enginemen and the carriers entered into an agreement known as the 1937 National Diesel Agreement which in general retained firemen on diesel locomotives in freight and yard service as well as on passenger trains. That agreement remained the basic rule in the industry as far as firemen were concerned until the award of Arbitration Board No. 282 went into effect.
While, as stated, the employment of firemen was governed for many years by the 1937 agreement, there was no "national rule", as far as brakemen and helpers were concerned. Depending upon local rules and practices the numbers of such employees varied from time to time and from place to place.
Between 1937 and 1959 in States not having full crew laws the carriers operated under the terms of the 1937 National Diesel Agreement and the particular rules and practices governing the numbers of brakemen and helpers to be utilized. This meant that during that period many, if not most, operations were being conducted with five man crews, and some operations were being carried out with crews of less than five men.
By 1959 the carriers had come to the conclusion that the retention of firemen in diesel service was unnecessary from any standpoint, including that of safety. The carriers had also concluded that as far as brakemen and helpers were concerned, *302 fixed crew consists should be eliminated. The general position of the carriers was that overall crew consists should be determined by managerial decision, and that proper decisions would be prompted by the carriers' own enlightened self interest.
When the carriers put forward their proposals, the Brotherhoods countered with demands that the firemen be retained; that in road service there should be not less than two brakemen; that in yard service there should be not less than two helpers; and that such additional brakemen and helpers should be employed as to insure maximum safety of operations. We think that the counter proposals of the Brotherhoods as to brakemen and helpers are not without significance in this case.
In 1960 the Public Service Commission of the State of New York on the basis of studies and hearings determined that the New York full crew law, which was not dissimilar to those of Arkansas, was not any longer making any significant contribution to railroad safety and recommended that it be repealed. It was repealed effective in June 1966, except that New York still requires firemen to be retained on locomotives.
In 1962 the Presidential Commission On Railroads recommended subject to certain qualifications that firemen be discontinued in road and yard service and that the numbers of brakemen and helpers to be employed should be determined by collective bargaining and arbitration. The carriers and Brotherhoods involved in this case participated in the proceedings before the Commission.
The award of Arbitration Board No. 282 permitted the discontinuance of firemen on 90 percent of diesel crews and gave to the BLF&E the right to determine the remaining 10 percent of the crews on which firemen were to be retained. As to brakemen and helpers the award provided in substance that the numbers of such employees should be determined ad hoc by special boards of adjustment in the light of certain guidelines spelled out in the basic award.
Following the award, freight and switching crews were reduced substantially which in at least many instances meant that road and switching operations were conducted with crews of less than five men. The award itself has now expired. As the Court understands the existing situation, the carriers are not free, in the absence of appropriate collective bargaining, to continue to reduce crew consists; on the other hand, they are not required automatically to restore positions which were eliminated while the award was in force. See Brotherhood of Railroad Trainmen v. Akron & B. B. R. R., D.C.Cir., 385 F.2d 581.
The statistical evidence as to the effect upon safety of the reductions in force authorized by the basic award and by the awards of the special adjustment boards is not entirely satisfactory either way; statistical evidence seldom is. The statistics do indicate that in 1964, 1965, and 1966 railroad accidents of various kinds increased, but that casualties resulting from railroad accidents fell. However, both trends are to be observed in years preceding the effective date of the award. From the whole evidence in the case, it appears to us that the reductions in force had no substantial effect on safety of operations, except to the extent that there were fewer railroad employees on duty to be hurt. Why accident rates have been increasing we do not know with certainty, but it would be pure speculation to say that crew size has had anything to do with it.
We have undertaken to consider all of the evidence in the case including the reports and awards which have been mentioned. As to the reports and awards, we are not bound by them, but we think that we are entitled to consider them. The Commissions and tribunals are, we think, entitled to some credit for expertness in the field; further, the reports and awards grew out of proceedings in which the plaintiffs and intervenors in this case participated, and the underlying issue about crew consists was the same as the issue here.
*303 We find from the overwhelming weight of the evidence that by the mid 1950's, if not before, the fireman on a diesel locomotive and the third brakeman or helper had, in general, ceased to perform significant safety functions in the operation and switching of freight trains and cars. We further find that without regard to employee categories freight trains have been operated and switched throughout the country for the past number of years with crews of five men or less, and that the operations have been conducted with safety. It follows automatically that such operations can be conducted safely with less than six men.
What has been said about the country as a whole is clearly applicable to Arkansas. Railroad operations in Arkansas are certainly no more dangerous than operations in other States having comparable terrain, population, and economies. Indeed, it well may be that operations in Arkansas are safer inherently than operations in some of the bordering States which contain more densely populated and more urbanized and industrialized sections.
The foregoing statement about Arkansas is corroborated at least up to a point by the fact that the short lines operating in this State seem to have had no safety problems resulting from the fact that they use crews substantially smaller than those called for by the statutes. While we are not prepared to accept wholeheartedly the contention of plaintiffs that there is "no difference" from the stand-point of safety in long line operations and short line operations, certainly the two operations resemble each other in the sense that both use and switch the same equipment, that the employees of both perform the same individual tasks in the same way, and that there are hazards common to both long line and short line operations.
Compliance with the Arkansas statutes places upon the carriers substantial financial burdens and also burdens them otherwise. As to cost of compliance in money the carriers' evidence is to the effect that the cost now amounts to $7,600,000 per year and can be expected to go higher. That figure seems to represent the direct outlay of the carriers in compensating the firemen, the extra brakemen, and the extra helper. That direct outlay is subject to offsetting costs that would be incurred if the two extra crewmen were eliminated; the carriers have not taken those offsetting costs into account in reaching their $7,600,000 figure, but it seems clear that after all reasonable offsets are taken into account, the net cost of compliance will remain very heavy.
Compliance with the statutes also involves the taking up of additional men when plaintiffs' trains approach or enter Arkansas and the dropping of such men when the trains leave Arkansas. We doubt that this burden is as great as the carriers would make it, but it does involve some delays and tends to interfere with continuity of operations.
We have now reached the point of decision.
Conceding that as late as the Norwood decision the question of the reasonableness of the Arkansas full crew laws was "fairly debatable," we are convinced with the requisite degree of certainty that the question is not fairly debatable today, and it is not made so by the fact that the Brotherhoods continue to debate it.
We find from the evidence as a whole that under present conditions continued enforcement of the statutes makes no signficant contribution to railroad safety, and that the statutes as they operate today are unreasonable and oppressive, and that they violate the Due Process Clause and unconstitutionally burden interstate commerce.
That is not to say that freight and switching crew signs are irrelevant to safety of operations. A train cannot be operated efficiently and safely or, indeed, at all, without a minimum crew consist, but we agree with plaintiffs that minimum crew consists vary with the facts and circumstances of particular railroad operations, and we hold that it is now *304 unreasonable and arbitrary for Arkansas to require six men for all operations in road service and urban switching without regard to surrounding facts and circumstances other than those set forth in the statutes.
It may be that in some exceptional circumstances a crew of six men or even more would be necessary for the safety of a particular train movement or switching operation, but the mere fact that an exceptional situation might dictate the use of a six man crew does not, in our estimation, justify the inflexible requirement of the Arkansas statutes that no less than six men always be used.
Even if we go one step further and indulge the very doubtful assumption that in all situations the very fact that three men, rather than two, are keeping a lookout, or that three men, rather than two men, are braking or switching, adds some increment of safety to the operation, we think that such an increment is negligible and speculative and not worth the cost.
With more specific regard to the contention of plaintiffs that the statutes unduly burden interstate commerce, we think that the financial burden of compliance, which is out of all proportion to the benefit, if any, derived, and the added burden involved in the taking on and discharging men at or near the Arkansas State line are sufficient to justify our conclusion that the statutes are unconstitutional burdens on commerce. We feel, however, that we should go somewhat further than that.
The Arkansas statutes were passed during a period in which the railroads were the undisputed masters of land transportation; they enjoyed a practical monopoly in that field. They competed, more or less, among themselves, but they had to compete with no other form of land transportation, and air transportation of passengers and freight had not come into existence.
Such is not the case today. As pointed out by the Presidential Commission, and as everyone knows, the railroads now compete with busses, trucks, pipelines, and airplanes. In Arkansas they will be competing in a few years at the most with barge transportation on the Arkansas River; they are already competing with such traffic on the Mississippi River and many of its tributaries both great and small.
Again as pointed out by the Commission, if the railroads are to meet this competition successfully, they must make efficient use of their resources and equipment and must be free to take advantage of improved technology and developments in the industry.
The Arkansas statutes in our view militate against that necessary efficiency and flexibility; they hamstring the carriers in the important field of labor relations, and impose upon them requirements not generally imposed throughout the country and not imposed in any of the States bordering Arkansas.
In the foregoing sense, as well as in the others mentioned, the statutes burden interstate commerce, and we think that the burden is undue and unconstitutional.
In holding the statutes unconstitutional we do not overlook the fact that a contrary result was reached in Public Service Commission of Indiana v. New York Central Railroad Co., Ind., 216 N.E.2d 716, decided in 1966, and in New York Central R. Co. v. Lefkowitz, 46 Misc.2d 68, 259 N.Y.S.2d 76, decided in 1965, affirmed by the Appellate Division of the Supreme Court of New York on June 29, 1967, 28 A.D.2d 735, 282 N.Y.S.2d 68. With due deference to those decisions and to the Courts rendering them, we come to the opposite conclusion.
Before bringing this opinion to a close we desire to point out that our decision does not prohibit the carriers from employing as many men as they may care to employ in road and yard service; it does not require them to discharge a single fireman, brakeman, or helper. It simply leaves plaintiffs free to work out their crew consist problems with the *305 Brotherhoods by means of collective bargaining within the framework of the Railway Labor Act without their hands being tied by statutes which at best are functus officio as far as railroad safety is concerned.
A decree enjoining enforcement of the Act is being entered.
NOTES
[1] Defendants and intervenors point out that in 1958 the people of Arkansas voted on a referendum petition directed at the statutes and refused to adopt it.
[2] It may be doubted that the statutes could be sustained under the Arkansas Constitution as "economic measures," but we do not pursue that subject.
[3] The Arkansas statute relating to the crews of passenger trains, Ark.Stats., Ann., §§ 73-723 and 73-724, is not involved in this litigation.
[4] In the course of the oral argument counsel for the carriers expressly waived any contention that the Arkansas statutes do not require firemen on diesel locomotives.
[5] The view which we take of the case renders it unnecessary for us to consider whether the statutes "discriminate against interstate commerce" or whether they violate the Equal Protection Clause.