# Pennsylvania Railroad Co., Appellant, v. Public Service Commission.

*Railroads—Crew of train—Passenger coaches—Baggage car—Act of June 19, 1911, P. L. 1053.*

In considering a complaint of a violation of the Act of June 19, 1911, P. L. 1053, commonly known as the Full Crew Law, the courts cannot consider the question whether or not the measures adopted to express the legislative will were the best that might have been selected, or the question whether or not the operation of the statute imposes upon the carrier companies a useless and burdensome expenditure of money. Such questions are for the legislature.

A train consisting of an engine, a United States mail car, a combined baggage and passenger car and five sleeping cars, is a train within the provisions of Sec. 5 of the Act of June 19, 1911, P. L. 1053, which prohibits a railroad company from operating "any train carrying passengers consisting of four or more passenger coaches, and one baggage car with a crew of less than six men to wit, one engineman, one fireman, one conductor, one baggageman, one brakeman, one flagman; this not to include the train porters or Pullman employees."

Sleeping cars are "passenger coaches" within the meaning of the law, inasmuch as the legislature must have had in mind that the public travel by night as well as by day, and that trains may be largely, if not entirely, composed of what are generally called Pullman cars.

The fact that a combined baggage and passenger car carried no baggageman for a portion of the train's run and was locked during such period, does not make it any the less "one baggage car" within the meaning of the act.

Argued May 4, 1917. Appeal, No. 12, March T., 1917, by plaintiff, from order of Public Service Commission, Complaint Docket, No. 488, in case of Pennsylvania Railroad Company v. The Public Service Commission of the Commonwealth of Pennsylvania. Before OR-LADY, P. J., PORTER, HENDERSON, HEAD, KEPHART, TREXLER and WILLIAMS, JJ. Affirmed.

Complaint for violation of the fifth section of the Act of June 19, 1911, P. L. 1053.

The complaint alleged that on November 12, 1915, the Pennsylvania Railroad Company operated train No. 26 between Harrisburg and Philadelphia, consisting of engine 460, one United States mail car, one combined baggage and passenger car, one day coach, one dining car, one parlor car and five sleeping cars in violation of Section 5, of the Act of June 19, 1911, in that the train was operated without a baggageman. The complaint prayed that upon final hearing the commission make such order in the premises as may seem meet.

The answer of the Pennsylvania Railroad Company admitted the facts contained in the complaint but denied that the train was run or operated in violation of Section 5, of the Act of June 19, 1911.

The commission entered an order against the railroad company in accordance with the complaint.

*Error assigned* was the order of the commission.

*S. B. Lloyd* and *G. S. Patterson,* with them *J. E. B. Cunningham* and *Charles H. Bergner,* for appellant.— Neither Section 5, nor any other section of the Extra Crew Law applies to a train constituted as Train 26 was constituted on the day complained of. Technical words relating to an art, science or trade, when used in a statute dealing with the subject-matter of such art, science or trade, are ordinarily to be taken in their technical sense, and will be so construed, unless the context or other considerations plainly show a contrary intent: State v. Murlin, 137 Mo. 297; Brockett v. Ohio & Penna. R. R. Co., 14 Pa. 241; Price v. Maxwell, 28 Pa. 23.

The act, by the use of the words "consisting of," refers to trains made up of the cars described and no others: Farish v. Cook, 6 Mo. App. Rep. 328.

The car containing baggage being locked, and there

being no duties for a baggageman to perform, it was not necessary to provide a baggageman.

*Berne H. Evans,* for the Public Service Commission of the Commonwealth of Pennsylvania.

*William N. Trinkle,* for the Brotherhood of Railroad Trainmen and the Order of Railway Conductors, intervening appellee.

OPINION BY HEAD, J., July 13, 1917:

Although the briefs filed by the several counsel concerned are elaborate and highly interesting, we are all of opinion the two questions that must control the judgment of the court lie within a narrow compass. Whether or not the legislature determined wisely in the enactment of the Act of June 19, 1911, P. L. 1053; whether or not the measures adopted to express the legislative will were the best that might have been selected; whether or not the operation of the statute imposes upon the carrier companies a useless and burdensome expenditure of money—in these days when waste of anything seems to be the country's most dangerous enemy—are certainly questions of the first importance to the State and its citizens. But we cannot dispose of them or any of them. The reason is manifest. In Penna. R. R. Company v. Ewing, 241 Pa. 581, all of these questions were urged upon the court by counsel, whose aid any client was fortunate to secure. Even the published report of the case as it appears in the official volume, clearly indicates every reasonable, perhaps every possible effort was made to escape what was considered by the carrier company the uselessly, burdensome features of the statute. All of these matters are thoroughly and convincingly disposed of in the opinion delivered by Chief Justice BROWN. It may not be amiss, even at the risk of lengthening this opinion to quote again the language of Mr. Justice MITCHELL in Commonwealth v. Moir, 199 Pa.

544: "Much of the argument and nearly all of the specific objections advanced, are to the wisdom and propriety and the justice of the act, and the motives supposed to have inspired its passage. With these we have nothing to do, they are beyond our province and are considerations.to be addressed solely to the legislature. This court is not authorized to sit as a council of revision to set aside or refuse assent to ill-considered, unwise or dangerous legislation. Our only duty and our only power is to scrutinize the act with reference to its constitutionality, to discover what if any provision of the Constitution it violates." The highest authority has thus declared that, in the passage of the Act of 1911, the legislature violated neither the letter nor the spirit of the fundamental law. The legislative will in such a case is the supreme law of the Commonwealth, and every citizen thereof, great or small, must render unhesitating obedience to its mandates. Our questions then are these: (1) Was the train operated by the appellant carrier described in .the complaint made to The Public Service Commission a train of the class or character within the fair meaning and intendment of Section 5 of the act? (2) If so, was it manned by the number of trainmen required by that section of the statute?

Now it is a presumption of law that every citizen knows the law because he is bound to obey it. It ought to follow, as a rational result flowing from the legal presumption, that the legislature would express its will in language that could be easily and readily understood by the people who must obey it. Hence the cardinal rule in the construction of a statute. The words used by the legislature in expressing the sovereign will should, first of all, be given their usual and popular meaning. We are not unmindful that in dealing with a subject that may be fairly considered scientific, artistic or otherwise technical, the lawmaker may with propriety use the accepted terms of the science, art or trade which will with recognized accuracy express the legislative intent.

But when we remember the object aimed at by the legislature in the act under consideration was to promote the safety of the traveling public and of the employees of the operating carrier, the argument advanced by the appellant along these lines seems to be without convincing force. In the light of these plain and always accepted principles, we turn to the language of the statute.

Section 5 of the Act of 1911 declares "It shall be unlawful for any railroad company......to run or operate over its road......any train carrying passengers consisting of four (4) or more passenger coaches and one baggage car with a crew of less than six (6) men, to wit, one engineman, one fireman, one conductor, one baggageman, one brakeman, one flagman; this not to include the train porters or Pullman employees." Now the appellant's history of the case thus describes the train, the operation of which the complaint alleges was in violation of the section of the statute we have just quoted. "This train consisted of an engine, a United States mail car, a combined baggage and passenger car, a day coach, a dining car, a parlor car and five sleeping cars." Assuming this to be a correct description of the train, we must now determine whether that train was within the class described in Section 5 of the statute.

We suppose it would be conceded it was a "train carrying passengers." Did it carry a baggage car? We have already seen there was a car described by the appellant company as a combined baggage and passenger car. It was fitted for the purpose of carrying baggage. It did in fact carry the baggage of the passengers. Whilst no baggageman was carried as part of the crew on the run from Harrisburg to North Philadelphia, it appears in the record that such baggageman from North Philadelphia to New York did constitute a part of the crew. The train that ran from North Philadelphia to New York was the same train, physically speaking, that was operated between Harrisburg and North Philadelphia. We think it could not be successfully argued the train car-

ried no baggage car from North Philadelphia to New York. Nevertheless, if there was then a baggage car which was a constituent part of the train, the same car, devoted to the same service, must have been a part of the train as it was operated between Harrisburg and North Philadelphia. The presence or absence of a particular employee, designated a baggageman, could not and did not change the character of the car. Did the fact that the car was locked between Harrisburg and North Philadelphia in any way change the classification of the car within the meaning of the statute? Express or freight cars may be locked and even sealed, yet they are none the less express cars or freight cars. We are of opinion thus far that the train in question was a "train carrying passengers" and that it consisted of, inter alia, "one baggage car."

Did it consist of "four (4) or more passenger coaches?" It certainly did consist of four (4) or more cars carrying passengers. It may be true, it doubtless is true, that certain kinds of passenger cars, equipped in a particular way, are usually designated, in railroad parlance, as day coaches, but as these coaches travel by night as well as by day, it must be apparent the classification of them as day coaches refers rather to their style and equipment than to the fact that they would be operated only in the day time. It appears to us that, in the use of the broad expression found in the statute, viz: "passenger coaches," the legislature must have had in mind that the public travel by night as well as by day; that trains may be largely, if not entirely, composed of what are generally called Pullman cars. Otherwise, why exclude Pullman porters and other employees in computing the number of those who should compose the operating crew contemplated by the act?

Perhaps we should not go far wide of the mark were we to say that, under normal conditions, the engineman personally directs the movement of the train, the fireman supplies the fuel necessary to create the motive power,

the conductor lifts the fares, and but little else may be required of others of the crew for the regular operation of the train. But, as we have said, the trains of a great railroad system must run by night as well as by day. They must run during the darkness, through fog, through storm and frost, and are necessarily subjected to many emergencies and conditions which may require of the crew the performance of duties that are in abeyance under normal conditions. The legislature doubtless had all these things in mind, as well as the weight, the momentum of a great train carrying perhaps hundreds of passengers, and in legislating for their safety it was determined that a train of the size and character of the one here in question should be manned by a crew of six men. In this run from Harrisburg to North Philadelphia, on the day named in the complaint, it confessedly was manned with a crew of but five men.

We are unable therefore to escape the conclusion that in this case there was a failure on the part of the appellant carrier to comply with the provisions of Section 5 of the statute. The record then, as certified to us, does not disclose that the order or decree complained of was unreasonable or not in conformity with law. The assignments of error are overruled.

The order of the commission is affirmed and the appeal is dismissed at the costs of the appellant.