This is a bill attacking the constitutionality of the act of assembly of June 1, 1937, P. L. 1120, which is commonly known as the Full Crew Act. *Page 312 
The issues as disclosed by the bill and answer bearing upon the constitutionality of the act are substantially as follows:
Do the requirements of the act for additional assistance have a reasonable relationship to the safety of employees and travelers; are the said requirements unreasonable and arbitrary; did the legislature have as its purpose in enacting the said law the use of the police power of the state or was the same enacted for the benefit of the additional employees; is the employment of an additional man or men unreasonable in the following: Multiple unit electric passenger train; an additional man on . . . locked baggage car[s] between terminals; an additional brakeman on a passenger train when the train consists of five or more cars [any one of which carries passengers, or on trains of ten or more passenger cars none of which carry passengers]; on freight trains when such trains consist of fifty or more cars; on local freight trains whenever and wherever such train does any switching or unloading of freight; a conductor and two brakemen for the movement of empty cars; two brakemen or helpers for switching movements in railroad yards or between yards; a third brakeman or helper on switching or yard engines, when such switching or yard engine crosses a public highway within the corporation limits of a municipality; every locomotive or self-propelled unit operating [on the main track] without cars shall carry a brakeman or conductor in addition to the engineer and fireman, or engineer's assistant; when two or more electric locomotives traveling on their own power on a main track without cars are coupled together, there must be provided a motorman and a motorman's assistant for each locomotive; is the amount of expenditures made by the plaintiff since 1913 in the way of improvements, conducive to safety and for the protection of plaintiff's employees, passengers and the general public; are any or all of these requirements for additional men unreasonable *Page 313 
and arbitrary and in no way conducive to the safer operation of the railroad or to the safety of employees and travelers; does the instant act violate article 1, section 1; article 3, section 3 of the Pennsylvania Constitution, also the Fourteenth Amendment of the Constitution of the United States, and article 1, section 8, paragraph 3 of the latter; is the instant act, as compared with the Full Crew Act of 1911 and the Full Crew Acts of other states, arbitrary and unreasonable; would the penalties which would be imposed under the instant act, if its provisions were violated by the plaintiff, work irreparable injury and inconvenience to the plaintiff in the operation of its railroad?
Many requests for findings of fact were filed of record some of which we have affirmed and others denied and so noted. Many findings were required. The findings of fact which we have affirmed viz: 279 of the plaintiff's requests, we adopt as our own. These are filed and we order them to be printed in the event of an appeal and are not herein set forth. We do this so as to avoid a bulky and unwieldy opinion and not with any intention to violate Equity Rule No. 67.
In all of the findings of fact references were made to testimony which we have considered together with the rest of the evidence and upon which we base our findings of fact, with a few exceptions, where reference is noted to the party's brief only. However we have checked the brief and find therein the reference to the testimony to support the finding, . . . which therefore makes it unnecessary for us to include in our discussion what is there said.
The bill prays for a preliminary injunction and upon examination by the court of the contentions in the bill, a preliminary injunction was granted on June 2, 1937, and a hearing thereon was held on the 7th day of said month and year, at which time a motion was made by the Deputy Attorney General to dissolve the preliminary injunction, which the court overruled. A motion *Page 314 
was made by the plaintiff to continue the preliminary injunction, and by agreement of the parties the hearing commenced on the 21st day of June, 1937. On June 21, 1937, several individuals representing certain brotherhoods of trainmen, et al., represented by private counsel, were permitted to intervene as parties defendant. The plaintiff put in a large volume of testimony consisting of about 2,400 pages, which was concluded July 27, 1937, whereupon the court continued the preliminary injunction until final hearing, and the 7th day of September, 1937, was set to take testimony as if on final hearing. In the meantime, on the 5th day of August, 1937, the defendants appealed to the Supreme Court from the court's granting of the preliminary injunction, and from the continuance thereof until final hearing. The appeal was disposed of on the 31st day of March, 1938, by the Supreme Court, which affirmed our court in granting the preliminary injunction, and approved our continuing the same until final hearing . . ., with a procedendo.
At the commencement of final hearing it was agreed by the parties that the evidence submitted by the plaintiff on the motion to continue the preliminary injunction should be admitted as if taken on final hearing.
The defendants on the 5th day of May filed their answer and on the 10th day of May, 1938, proceeded in taking their testimony, and that, without any interruptions, continued until the 29th day of July, 1938, consisting of approximately 4,100 pages, making a total number of pages of testimony taken of about 6,500; 379 exhibits have also been introduced by both parties.
 ANALYSIS OF THE ACT.
We do not concur in the contention in the bill, and it is not urged by the plaintiff, that the title of the act is bad. We shall give no further consideration to this.
Section 1 of the act and the subsections thereunder are definitions of words and terms used in the operation of a railroad. *Page 315 
Section 2, in the first part thereof, in substance provides that the crew shall consist, inter alia, of . . . [one engineer, one fireman, one conductor and one] brakeman when the passenger train consists of less than five cars; and, in the latter part of the section, when the train consists of five cars or more any one of which carries passengers or consisting of ten or more cars none of which is carrying passengers. (The number of additional men shall be one brakeman) and when baggage is received, cared for and handled on any such train at least one baggageman shall be added to the members of the crew, except in a single motor unit carrying passengers when it shall be manned by not less than three men. (The evidence discloses that this section of the act would require the employment of 319 additional men.)
Section 3 relates to any freight train consisting of less than 50 cars, the crew of which shall consist of not less than one engineer, one fireman, one conductor and two brakemen.
Section 4 provides that on a freight train consisting of 50 cars or more, the crew shall consist of not less than 1 engineer, 1 fireman, 1 conductor and 3 brakemen. (The evidence disclosed that this section would require the employment of 455 additional men.)
Section 5 provides when any local freight train is doing switching or unloading of any freight of any nature whatever, the crew shall consist of not less than 1 engineer, 1 fireman, 1 conductor and 3 brakemen. (The evidence discloses that this section would require the employment of 249 additional men.)
Section 6 provides that all other trains not specifically referred to in the act shall be manned by a crew of not less than 1 engineer, 1 fireman and 2 brakemen.
Section 7 provides that it shall be unlawful for any carrier to use, operate or permit any locomotive, to be used or operated in any railroad yard, or on any railroad track to handle or switch cars or to transfer *Page 316 
cars from one railroad to another or from one railroad yard to another railroad yard unless each and every such locomotive while so doing shall be manned by a crew which shall consist of at least 1 engineer, 1 fireman, 1 yard conductor or foreman, and two yard brakemen or helpers; or when any such locomotive is so used or operated over or upon a highway or street within the corporate limits of a municipality such locomotive shall be manned by one additional yard brakeman or helper, etc. (The evidence discloses that this section would require the employment of 850 additional men.)
By section 8 it shall be unlawful for any carrier to operate or permit to be operated on its main tracks any single locomotive unless said locomotive is manned by a crew of not less than 1 engineer, one fireman, 1 conductor or brakeman with the proviso that where two or more locomotives are operated under their own power on any main track and coupled together there shall be provided a crew of 1 engineer and 1 fireman for each locomotive, and in addition thereto 1 conductor or brakeman. (The evidence discloses that this section would require the employment of 300 additional men.)
Section 9 . . . [requires a crew of not less than one engineer, one conductor and one brakeman on any self-propelled pile driver, crane, brown hoist, or other engine, operating as a locomotive on the main tracks].
There are other provisions but we do not think them important to the questions at issue heretofore referred to, except sections 11 and 13, the first of which provides that a violation of any of the provisions of the said act shall be a misdemeanor and any railroad company, its officers or agents, or any person operating a railroad shall be liable to a penalty of $100 for each and every violation. Section 13 provides that the act is severable and if any of the provisions thereof are held to be unconstitutional such decision shall not be construed to impair any other provisions of the act. *Page 317 
In Section 15 it is provided that the act shall become effective immediately upon its final enactment.
 CREDIBILITY OF WITNESSES.
Many witnesses were called on both sides and testimony given by the plaintiff was to some extent contradicted by some of the witnesses for the defendants. We have taken into consideration their respective interests in the case, their partisanship and their testimony as to whether or not it is speculative or based upon actual occurrences, and amongst other matters, the accidents which have occurred, their causes, and whether or not they might have been prevented by additional assistance, and accordingly have found the facts.
In passing upon the constitutionality of this act we start with the presumption that the act is constitutional and that the burden is on the plaintiff to prove that it is unconstitutional and although the expressed purpose of the act is under the police power of our state and therefore paramount to all else, there is the restriction that it must be reasonable under existing conditions as provided and not unreasonable and arbitrary.
 SUPREME COURT OPINION.
In the appeal the record contained the whole of the plaintiff's testimony, except that which was taken in rebuttal.
The opinion of the Supreme Court in this case is comprehensive of the principles of law applicable to the case and is guidance to us in the matter to be considered. We need not look outside of this opinion for the applicable law . . .
We are of the opinion that under the comprehensive instruction of the Supreme Court in the instant case, we need not refer to the case of Penna. R. R. v. Ewing, [241 Pa. 581], nor to any of the cases of the courts of other states or the Supreme Court of the United States in consideration of the questions here involved, because *Page 318 
the evidence of the defendants has not overcome the situation which was presented to the Supreme Court which induced the writing of its opinion.
In our study of the testimony and argument of both sides of the case we have reflected our opinion thereof in our findings of fact, all based upon the evidence and the references thereto noted, except a few which are argumentative.
 INSPECTION.
During the taking of the testimony we made the suggestion that it is our opinion we must presume that every employee faithfully performs his duty, whatever it may be, and that every train or car which comes into a yard must be carefully inspected by the yard inspectors because the rules so require, and if any remedial requirements exist, the train or car is repaired at terminals or elsewhere, so that when the trainmen again receive the train there is a presumption that each and every car has been examined and found proper for transportation use. . . . It is one of the duties of the brakemen and other trainmen when trains stop en route, to make an inspection . . . and also at other opportunities make inspections of passing trains and give notice to the proper person of any condition observed which might cause an accident . . .
 SAFETY DEVICES AND IMPROVEMENTS.
During the period from 1911 to 1937 the plaintiff's evidence discloses, and it is not contradicted, that improvements have been made, and the following devices installed or improved: automatic block signal system; automatic signals (cab); interlocking devices (series of switches and crossings), slide detector and fences; flashing light signal protection; dragging equipment; detector devices; air brake system including anglecock and back-up hose; conductor's valve; safety appliances (as required by Federal Acts or I.C.C.); improvements in rolling equipment; in wheels, couplers; elimination *Page 319 
of wooden cars by substituting steel passenger and freight cars; axles; rollerbearings; metallic steam-heat connections on engines and passenger cars in substitution for rubber hose; draft gear; freight car trucks; brake beam safety supports; strengthening of hopper cars; hopper bottom door latches; deeper ballast; heavier rails; heavier engines; grabirons; ladders.
The evidence also discloses that from 1911 to 1936 the plaintiff has expended for the above devices and improvements $122,048,801 in this State, and upon its whole system, $286,168,916, all of which contributes and has contributed to the subject of safety; and which is reflected in the great decrease of accidents which is later shown. It is proved by the plaintiff's employee and witness, Carrow, Superintendent of Safety, that his duty is that of making a constant study of new devices and improvements for the purpose of the promotion of safety. Plaintiff was spending, at the time of the hearing, $14,000,000 annually in the State of Pennsylvania, all of which does promote safety and results in a large decrease of injuries.
 ADDITIONAL COST UNDER THE ACT.
The plaintiff contends that the additional cost, over and above the cost of the men presently employed, is in excess of $4,500,000 annually. The evidence of the plaintiff discloses that the summary as of January 21, 1937, added annual costs by the requirements of the Act as follows:
 Men Compensation Men Compensation
Section 2 Through Passenger Brakemen ........ 103 $207,165 Baggagemen ...... 76 183,533 Steam Locals Brakemen ........ 36 64,569 Baggagemen ...... *Page 320 
Multiple Unit Brakemen ........ 6 $10,908 Baggagemen ...... 2 3,744 Firemen ......... 73 140,099 Gas Electric Brakemen ........ 7 13,610 Firemen ........ 8 16,406 Mixed Trains Brakemen ........ 8 16,361 319 $656,395 Section 4 Brakemen ........ 455 846,686 455 846,686 Section 5 Brakemen ........ 249 483,060 249 483,060 Section 6 Brakemen ........ Section 7 Operating over or upon highways Brakemen ........ 506 1,108,289 Not operating over or upon high ways Brakemen ........ 277 573,407 Conductors ...... 53 117,896 Firemen ......... 14 26,735 850 1,826,327 Section 8 Brakemen ........ 274 534,743 Enginemen ....... 13 35,315 Firemen ......... 13 25,914 300 595,972 ---------- ------------- Total ............................ 2,172*
$4,406,482* Unemployment Insurance Taxes ............................ 88,471 Railroad Retirement Taxes ............................... 121,648 ------------- Total ........................................... $4,616,601*
* The chancellor's estimates of the number of additional men required by, and the cost of compliance with, the Act have been reduced by striking out 9 additional men, at $15,118, under Section 9, and one fireman at $1,957.50. *Page 321 
The defendants contend that the plaintiff is in error in this computation and has submitted the following argument:
"In preparing its exhibits showing the estimated increased cost of adding additional brakemen, no consideration was apparently given to the fact that many of plaintiff's crews upon which it is stated that additional men will be needed, in effect carry an assist brakeman."
We do not find this contention to be correct. The testimony discloses that consideration was given in the computation only to the additional men that would be required to be hired in excess of the number actually employed at the time of the passage of the act.
The defendants also contend that the plaintiff's estimate, $4,423,058, as the cost to comply with the requirements of the act, is excessive. Defendants allege that the additional cost thereof would be $3,093,934. Deducting the amount which the defendants admit the cost would be from the amount testified to by the plaintiff, would leave $1,329,124, which is made up by various items, viz.:
First: It is not necessary to employ a baggageman on . . . locked baggage car[s] which is a part of passenger trains. In the computation this item amounts to $187,277. The testimony shows that baggage is and will be loaded on a baggage car at the starting point of the train by the employees at the station and at its first stop the car or cars will be unlocked and baggage which may be thereon destined for that place will be unloaded and any baggage from that place to be taken farther along will be loaded on the car which will be again locked, and the same action will take place at each stopping point. In our opinion baggage is received, cared for and handled in this way; and the obvious purpose of the act is to require it to be done in all cases by a train baggageman, through the requirement that trains on which such work is done shall always carry *Page 322 
a baggageman on . . . locked baggage car[s]. The act must be construed from its plain language. This question was decided by the Superior Court in the case of Pennsylvania Railroad Co. v.Public Service Commission, 67 Pa. Super. 569, where it was held:
"The fact that a combined baggage and passenger car carried no baggageman for a portion of the train's run and was locked during such period, does not make it any the less 'one baggage car' within the meaning of the act."
Second: The defendants contend that under section 5 of the Act relating to the subject of local freight trains, the Act should not be construed to include the type of local freight trains known as "mine run" trains and the type of local freight train known as "road shifters" and "track shifters." With this construction we do not concur. The defendants contend that there should be deducted on that account from the plaintiff's estimate $138,481. The pertinent language of the said section is as follows:
"It shall be unlawful for any carrier to operate . . . any local freight train doing any switching or unloading of any freight of any nature whatever without a full crew . . . which shall include three brakemen. . . ." A "mine run" train, as the testimony shows, is one that goes out to various mines on the various branches with empty coal cars for placement and removal of loaded cars from the mines. In this work shifting is required; and the testimony further discloses — even some of the defendants' witnesses have testified, that a mine run train is local freight. We do not agree with defendants' contention in this.
Third: Defendants contend that section 7 of the Act should not be construed to require a third brakeman on switching crews which operate over or upon highways within municipalities where the crews simply operate over or upon such highways in the course of their work and do not actually move cars backward and forward *Page 323 
over or upon highways in the course of separating them and placing them on different tracks, and that there should be eliminated from the estimate of the plaintiff as to this, the sum of $224,259.98. Said section 7 provides: "It shall be unlawful for any carrier to use, operate or permit any locomotive to be used or operated in any railroad yard oron any railroad track to handle or switch cars or to transfer cars from one railroad to another or from one railroad yard to another unless each and every locomotive while handling or switching cars shall be manned by a full crew. . . . When any such locomotive is so used or operated over or upon a highway or street within the corporate limits of a municipality such locomotive shall be manned by one additional yard brakeman." (Italics ours.)
As we understand, the defendants' contention is that by this section of the act a third brakeman is required only where a crew moves cars back and forth through switches upon the highway while the cars are being separated from each other and placed on different tracks. Switching is synonymous with the word shifting and the word shifting means the actual movement of cars back and forth over one or more switches. The latter part of this section provides: "when any such locomotive is so used." The word "so" necessarily refers to the previous language in the section, to wit: "to handle or switch cars, etc." This Act forbids the locomotive to be used or operated on a street or highway within a municipality without a third brakeman and we are unable to limit the requirements only to those cars where the locomotive is operated on or across the highway while actually switching or shifting cars. The defendants give no heed to the word handle. We cannot treat it as synonymous with switch; handle is a different and broader term than switch. We disagree with the defendants' contention that the last above mentioned sum should be eliminated from the computation of the cost as made by the plaintiff. *Page 324 
Fourth: The defendants contend that section 8 of the Act, which requires "light engine" to carry a brakeman in addition to the engineer and fireman when operating on main track, should not be construed to apply to "light engine" movements within the limits of yards and interlocking plants and that the figures as estimated on account thereof by the plaintiff, to wit: $254,877, should be eliminated. The defendants contend that a main track being defined in section 1 of the act as a continuous track, tracks in terminal areas, interrupted by switches and interlocking plants, are therefore not continuous. At the argument when defendants' counsel was asked by us whether the fact that a track may go through certain switches ceased to be a continuous track within the meaning of the statute, and whether he meant by the words continuous track, a track which did not go through switches of any kind, he said: "No, that is narrowing it down a little too close." Defendants' counsel also admitted that the fact that a track runs through yards does not prevent the track from being a main track. In the defendants' brief an attempt is made to distinguish between what is called "light engine main line movements" and "light engine yard movements" and in this manner attempts to show why the above sum should be eliminated from the plaintiff's computation and thereby reduce plaintiff's cost estimate. They argued that a track within the yard limits of a terminal like Philadelphia, Harrisburg or Altoona is not a continuous track because the tracks outside of the terminal are separated from the tracks within by switches and interlocking through which they cannot be traced as identical entities; and, secondly, that the tracks within the terminals are not tracks over which through trains operate through and between stations. We are of opinion that the term "continuous track" applies to any track which, irrespective of switches or cross-overs, affords a continuous route over which through trains may pass. The defendants also seek to place a limitation *Page 325 
on the words "through and between stations." They contend that the words "through and between stations" indicate that the legislature had in mind intermediate stations through which the main tracks of a railroad pass without interruption. An intermediate station is the only type of station that through trains operate through and between. If the legislature had intended to exclude tracks within the yard limits of terminals it would have been easy for it to have said so. Instead, the language which it employs includes any track which, through switches or otherwise, is continuous in the sense of affording a continuous route over which through trains pass through a station on their way between other stations. We are of opinion that when light engines in the course of their movements find it necessary to move on such a track they are clearly within the requirement of the statute, and the statute says nothing whatever as to the distance, long or short, that they must move over the track. It is sufficient if they move over the track at all. We are of opinion that this item of cost should not be eliminated from the plaintiff's estimate.
Fifth: The defendants contend that plaintiff's cost estimate should exclude any item for additional yard brakemen on crews moving empty passenger trains into and from the Pittsburgh Passenger Station and Broad Street Station, Philadelphia, and should also be reduced by an additional large amount which plaintiff might save by transferring this work from yard crews to passenger road train crews, and contends that there should be eliminated from the plaintiff's computation the sum of $137,272 for additional men at Philadelphia, also $104,324 for the additional 51 yard brakemen alleged to be necessary at the Pittsburgh Terminal, and also $113,759 for additional yard conductors, making a total for elimination on this count of $355,355.
The evidence discloses that the trainmen's work connected with moving empty passenger trains to and from *Page 326 
the Pittsburgh passenger station and Broad Street station, Philadelphia, is now performed by yard trainmen known as "house-conductors," "backout men" and "utility men." In such movements, which are for very short distances between the station and the passenger coach yard, only one trainman is now employed on each empty train (R. 1362a-1363a; 6455). Section 7 of the Full Crew Act provides that "it shall be unlawful for any carrier to use, operate or permit any locomotive to be used or operated in any railroad yard or on any railroad track to handle or switch cars . . . unless each and every such locomotive while handling or switching cars shall be manned by a full crew," which shall include not less than one yard conductor and two yard brakemen. Under this language it is clear that when a locomotive is handling passenger cars by moving them from the yard to the station or from the station to the yard it is necessary that the movement shall be manned by a full crew consisting of a conductor and two brakemen. It would therefore be necessary in the case of all such movements for plaintiff to add two men to the present back-out man or house-conductor; and defendants argue that this item is unwarranted and should be eliminated for one or the other of two alternative reasons. They contend in the first place that if Section 7 does in fact require a crew of a conductor and two brakemen for so-called back-out movements plaintiff could evade the requirement of employing additional yard trainmen by causing the work to be performed by the so-called road passenger crew who have brought the train into the station or are about to take it out from the station, and that by doing this plaintiff could also save a large sum of money. It is not within our province to order or suggest to plaintiff how it shall operate its road; that must be left to the sound judgment of the management of the plaintiff. Secondly, defendants contend that Section 7, if properly construed, has no application to back-out movements. *Page 327 
As to the second contention which is that a minimum yard crew of a conductor and two brakemen is not required for back-out movements by Section 7 because such movements do not involve any switching, . . . we think Section 7 deals with "handling" on exactly the same terms as "switching," and handling brings within the latter term any movement of cars by a locomotive. Furthermore, it is to be noted that Section 7 requires a full yard crew of three men whenever cars are "handled" in any railroad yard, or on any railroad track. To bring Section 7 into operation, it is not necessary that a movement should fall within the provision of the section which relates to the transfer of cars between two yards. As we have previously said, handling is a broader term than switching. The section applies equally to movements which consist in handling cars "in any railroad yard." We cannot exclude this said sum of $355,355.
Sixth: The defendants contend that plaintiff's cost estimate is inflated by basing those estimates in certain cases upon present operating methods and schedules, instead of readjusting such methods and schedules to provide for stops nearer the state lines of New Jersey and Ohio where the extra men could leave the train after a shorter period of service and return in service on another train than if they were required to be carried, on the basis of present schedules, farther into the adjacent State, and that there should be eliminated on this account the sum of $34,840. Defendants, in their brief, . . . contend, "The plaintiff railroad, for the purpose of this case, arbitrarily made these assignments to their existing schedules without any attempt to revise such schedules or to make the assignments in an economical manner." There is no proof of this.
Rearrangement of schedules and the introduction of additional stops might save the sum of money suggested by the defendants, but, as we have heretofore substantially stated, we have nothing to do with the arrangement *Page 328 
of the schedules; there is not even any implied power in the Act for us so to do; that must be left to the sound judgment of the management thereof. We cannot exclude this item of $34,840.
Much evidence pro and con was taken upon the subject of improvements made by the plaintiff upon its lines, yards, etc., within its system as a whole but more particularly that part of its system within the State of Pennsylvania, to wit: Automatic block signal, other signal devices, roadbed, rails, engines, passenger cars, freight cars, couplers, air brakes, including the anglecock and back-hose, telephone; improvement in inspectional methods, ladders, etc. Some of the safety devices have been improved since their installation.
We are of opinion that each has contributed somewhat, and all together they have and are contributing much to the subject of safety, and are also effecting a reduction of inspectional duties on the part of the operating crews. Besides this, rules relating to safety have been adopted by the plaintiff and the brotherhoods in conference. All of these are included in our findings of fact and bear upon the reasonableness or unreasonableness of the instant Act, and whether or not the Act is arbitrary.
 ACCIDENTS.
In our findings of fact it is disclosed that on the plaintiff's lines in the State of Pennsylvania the number of deaths of employees of the plaintiff during the fiscal year 1915-1916, when the Full Crew Act of 1911 was in force, was 161; the average per year for the 6-year period 1931-1936, inclusive, when we had no Full Crew Act in force, was 26; the number of injuries to employees for the fiscal year 1915-1916 was 4020; the yearly average for the period 1931-1936 was 264; the number of deaths of passengers during the fiscal year 1915-1916 was 8; the yearly average for the period 1931-1936 was 2; the number of injuries to passengers for the fiscal year 1915-1916 was 235, whereas the yearly *Page 329 
average for the period 1931-1936 was 80. In the year 1936, being the year just before the present Act was passed, the number of casualties to passengers was 75; the casualties to employees on duty for the same period was 19 killed and 307 injured (Plaintiff's Exhibits Nos. 10, 11 and 12).
The evidence discloses many of these accidents were caused by negligence; many from slipping or falling and from various causes none of which accidents could have been prevented by the addition of another man or other men.
From all of the evidence, we find in the list of accidents resulting in death or injuries to employees, or persons crossing the railroads at public highway crossings on the main line, in terminals, in switching, shifting and backing movements, in yards, of light engines, and by multiple unit engine trains, that few, if any, accidents have occurred through causes which might have been discovered beforehand, or could have been prevented by an additional man in the particular case.
The defendants contend that "Plaintiff's private accident records known as CT-75 reports clearly indicate that there is an amazing disparity between them and the Form T reports predicated upon them, with respect to the real causes of accidents."
The evidence shows that what was said in the Form T reports sent to the Interstate Commerce Commission was all that the latter required in the form of reports, which said reports were made up from the company's CT-75 forms, as shown by the witness, Carrow, Superintendent of Safety. This witness also testified that the facts and data concerning accidents are assembled in the office of the superintendent of the particular district and then by the superintendent transmitted to the Safety Department where they are collated and then sent over oath to the Commission.
The testimony shows that when an accident occurs the superintendent of the district in which it has occurred *Page 330 
gathers the evidence pertaining thereto, notes it on form CT-75 and transmits it to the Superintendent of Safety.
. . . . . . . . . . .
[The discussion on Interstate Commerce is omitted, as well as that on Due Process under the Federal Constitution.]
 ACCIDENTS IN YARDS, TERMINALS, ETC.
As is disclosed, a mass of testimony has been taken and reviewed by counsel and the chancellor. The defendants have produced much relating to operation at terminals, in yards and services to and from industrial plants. As the record shows, few accidents have occurred at any of these places, and the substance of the evidence of the defendants' witnesses is that an additional man would help, but it is speculative as to what might happen in the future. The best exponent relating to safety for the future is what accidents have happened, the causes thereof, under what circumstances and conditions, and whether or not any of these accidents could have been prevented by additional help. It is highly speculative to infer that an additional man would prevent them.
We have no evidence on the third issue raised by the pleadings, to wit: The legislative intent of the Act. We cannot say what the legislature had as its purpose in enacting the said law. We must presume that its purpose was honest and just, although mistaken. We cannot inquire into the proceedings of its enactment to obtain the motive. We must and do deny it.
. . . . . . . . . . .
[The discussion on the Public Utility Commission is omitted, the subject being treated in the opinion of this Court.]
 CONCLUSIONS OF LAW.
1. The provisions of Sections 2, 4, 5, 6, 7 and 8 of the said Act of June 1, 1937, P. L. 1120, violate Section *Page 331 
1, Article I, of the Constitution of the Commonwealth of Pennsylvania and are unconstitutional and void, for the reason that the said sections are arbitrary and unreasonable and have no tendency to promote the safety of employees or travelers upon railroads in any actual or substantial way, and are not a proper exercise of the police power of the Commonwealth in that the said sections impose upon the plaintiff excessive burdens and expenditures for purposes having no relationship to the promotion of safety, or any other legitimate police power purpose.
. . . . . . . . . . .
[The second conclusion of law, relating to the fourteenth amendment of the Constitution of the United States, is omitted.]
. . . . . . . . . . .
[The third conclusion of law, relating to Article I, Section 8, paragraph 3 of the Constitution of the United States, commonly known as the "Commerce Clause," is omitted.]
4. The addition of an extra passenger brakeman to each passenger train of five cars or more, any one of which carries passengers, as required under Section 2 of said Act, would not promote the safety of passengers attempting to leave the train while in motion, since railroads are under no legal duty to prevent passengers from leaving a train while in motion, and therefore the addition of extra trainmen would have no tendency to effectuate that result.
5. The addition of extra brakemen on yard crews operating over or upon highways or streets, as required under Section 7 of said Act, would have no tendency to provide protection for highway users against dangers which are or should be obvious to them, since railroads are under no legal duty to provide such protection, and the presence of additional trainmen would accordingly have no tendency to effectuate that result. More particularly, *Page 332 
railroads are under no legal duty to provide warning or protection to highway users at grade crossings or on streets or highways where an engine or a draft of cars is on the crossing or street or highway and is visible to such highway users, the presence of the engine or draft on the crossing or street being sufficient warning to them of the dangers incident thereto.
6. A permanent injunction must be granted against enforcement of the Act.
Exceptions by defendants to adjudication and decree nisi dismissed, and decree nisi made final. Defendants appealed.
Errors assigned, among others, related to the action of the court below in overruling defendants' exceptions.
This appeal is from the decree of the court below holding unconstitutional certain sections of the Act of June 1, 1937, P. L. 1120, commonly known as the Full Crew Act.
When this case was here before (330 Pa. 97), we discussed the legal principles applicable to the Act and the relevant facts as they then appeared. The case was remanded to the court below so that appellants could present facts to show that the regulations imposed by the contested sections, or any of them, bore a reasonable relation to the purpose asserted by the legislature to *Page 333 
be accomplished, appellee having made out a prima facie case.
The chancellor conducted extensive hearings whereat more than 4200 additional pages of testimony and exhibits were produced, bringing the total number of record pages to more than 7000, upon which 282 basic findings of fact and a number of conclusions of law were made. These findings expressly refuted the contentions of the defendants, and the chancellor thereupon held that Sections 2, 4, 5, 6, 7 and 8 of the Act had no reasonable relation to the safety of appellee's employees or passengers, or of the public, and that those requirements, being oppressive, unreasonable and arbitrary, were unconstitutional in their application to appellee. Three hundred and forty-six exceptions, including those to the rejection of appellants' requests, were filed. The court en banc sustained all of the findings and conclusions, dismissed the exceptions, and entered a final decree holding the sections above enumerated unconstitutional under the State and Federal Constitutions.
Our inquiry is merely to ascertain whether there was sufficient evidence upon which to base the findings of fact, and whether the law has been correctly applied. We have always held that findings of fact by the chancellor, approved by the court en banc, and supported by competent proof, are binding on this Court.[1]
We have reviewed the entire record with great care, analyzing the exceptions and assignments of error, and are of one mind that the testimony amply supports the findings of fact of the chancellor and the court en banc. These findings are affirmed.[2] *Page 334 
The court below found that there was no real, present danger for the Act to correct, nor any potential danger so apparent, or probable, that would call for the expenditure by appellee of the large sums of money required by the Act, and that, in any event, the employment of additional man-power would not obviate or prevent the suppositional hazards. Generally speaking, the accidents reviewed were attributable to human frailties, under circumstances which additional men could, or would, not remedy.
It is urged, however, that, notwithstanding this, the legislature having spoken, the cost of putting the Act into effect should not be considered. We answered this contention in our former opinion (330 Pa. 97, at 105-107) and it is unnecessary here to repeat our discussion. The Act is a regulatory measure, within the class of legislation under which the Public Utility Commission acts. The Commission, as an arm of the legislature, has power to make certain regulations for utilities, but if the cost of compliance therewith is arbitrarily and unreasonably oppressive, such orders will be held void. See Lehigh Valley R. R. Co. v. Commissioners,278 U.S. 24; Nashville, C. St. L. Ry v. Walters, 294 U.S. 405. The fact that the legislature has promulgated such regulations by its own general statute does not exempt them from judicial review.[3] The act of either body is subject to review by the independent judgment of a judicial tribunal. Ohio Valley WaterCo. v. Ben Avon Borough et al., 253 U.S. 287.
Appellant further contends that this Act, applying to a particular class, cannot be declared unconstitutional as to one member of the class unless declared unconstitutional as to all. As we pointed out, this Act is *Page 335 
a regulatory measure, promulgated by the legislature instead of the Public Utility Commission. General orders of the Commission may be unconstitutional as to one utility, and constitutional as to others. Moreover, we have held in a number of cases that a statute may operate in an unconstitutional way as to one particular individual or company, as to which it may be declared void, and yet may, as to others still be effective.[4]
Upon the basis of the facts found, the court below concluded that the sections in question violated the Constitution of this State, and enjoined the Public Utility Commission from enforcing them. The Commission, under its general and specific powers, could not, of course, by order or otherwise, put into effect against appellee the requirements of the various sections which are held arbitrary and unreasonable in any of the situations disclosed at the trial, nor could the legislature by indirection have done what is here attempted, and which we have held invalid as to appellee.
The admission of the Form CT-75 Reports, being appellee's records of the various accidents, is, within our decisions, an exception to the hearsay rule.[5] These records are required to be kept by the regulations of the Interstate Commerce Commission, subject to its inspection, and their falsification is made a misdemeanor. They may therefore be considered admissible as official records.[6] *Page 336 
As the decree of the court below strikes down only the sections of the Act noted, there is no need to consider the question of severability. Nor is it necessary to discuss the various factual questions presented as it would involve a lengthy recital of the evidence, which has been so well summarized by the court below in its findings of fact. What impressed us most was the highly speculative possibility of the danger of accidents alleged to exist. The resultant effectiveness of the Act under these circumstances could only be out of all reasonable proportion to the cost involved, which was found to be more than $4,500,000, or, as conceded by appellants, at least, in a request for a finding of fact, $2,900,000.
While we affirm the opinion of the court below, there are some modifications which have been indicated and will be found in the Reporter's Notes. These few inaccuracies do not affect the chancellor's findings of fact or conclusions, and have no bearing upon the decision of the court en banc. It is sufficient for us to hold that Sections 2, 4, 5, 6, 7 and 8[7] of the Act of June 1, 1937, P. L. 1120, as applied to appellee violate Sections 1 and 9 of Article I, of the Constitution of the Commonwealth of Pennsylvania. Although the court below held that these provisions violated also the Fourteenth Amendment and the Commerce Clause of the Federal Constitution, it is unnecessary for us to pass on those questions in view of the clear violation of our own Constitution.
Decree affirmed at appellants' cost.
[1] Belmont Laboratories, Inc., v. Heist et al., 300 Pa. 542, 546;White et al. v. Old York Road Club et al., 318 Pa. 346, 352;Campbell et al. v. Bellevue Borough School District, 328 Pa. 197,201-202; Chambley et al. v. Rumbaugh et al., 333 Pa. 319,324.
[2] In finding No. 257, the figures 2,182, $4,423,558, and $4,633,677 are amended to read 2,172, $4,406,482, and $4,616,601, respectively.
[3] Seaboard Air Line Ry. v. Blackwell, 244 U.S. 310; Penna. R. R.Co. v. Phila. County, 220 Pa. 100; and see Com. ex rel. v.Railroad Co., 23 Pa. Super. 205. See also Stone Othersv. Farmers' Loan Trust Co., 116 U.S. 307, 331; ReliefElectric L., H. P. Co.'s Petition, 63 Pa. Super. 1, 9.
[4] Ward's Appeal, 289 Pa. 458, 468; Taylor v. Moore, 303 Pa. 469,472; Turco Paint Varnish Co. v. Kalodner, 320 Pa. 421,435-436; Commonwealth v. Columbia Gas Electric Corp., 336 Pa. 209. See also Penna. R. R. Co. v. Phila. County, 220 Pa. 100,112; Jacobson v. Mass., 197 U.S. 11, 39; Village ofEuclid et al. v. Ambler Realty Co., 272 U.S. 365, 395.
[5] See Specktor et al. v. Victory Ins. Co., 282 Pa. 429; Ehmlingv. D. L. Ward Co., 279 Pa. 527; William Zoller Co. v. HartfordFire Insurance Co., 272 Pa. 386.
[6] Kalbach v. Philadelphia Reading Ry., 277 Pa. 307; and seeAmerican Life Insurance and Trust Company v. Rosenagle, 77 Pa. 507; Laginsky et al. v. McCullough, 280 Pa. 286, 290-291.
[7] In appellants' Statement of Questions Involved, it is said that Section 6 requires "two brakemen on trains consisting of empty passenger, express, mail or freight cars," whereas the section relates to: "All other trains not specifically referred to hereinbefore." The court below made no separate finding of fact or conclusion of law with reference to this section and appellants requested none. However, the court's first conclusion of law embraces that section and is amply supported by the evidence appearing in the record in view of the vague and general nature of the requirement. *Page 337